UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 18-33822-KLP |
| DELTA CAREER EDUCATION CORP., *et al.*, | ) | Chapter 7 |
| | ) | |
| *Debtors*. | ) | (Jointly Administered) |
| | ) | |
| HARRY SHAIA, JR., TRUSTEE | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| v. | ) | Adv. Proc. No. |
| | ) | |
| R. DAVID ANDREWS, | ) | _____ |
| NICHOLAS A. ORUM; | ) | |
| WILLIARD E. LYNN; | ) | |
| JOSEPH A. KENNEDY, III; | ) | |
| JOHN P. OLSEN; | ) | |
| ANDREW J. MEYERS; | ) | |
| TIMOTHY J. RYDER; | ) | |
| BILL NANCE; | ) | |
| KEVIN A. SMITH; and | ) | |
| CHARLES P. BRISSMAN, | ) | |
| | ) | |
| *Defendants*. | ) | |

## **COMPLAINT**

Harry Shaia, Jr., Trustee (the "**Trustee**"), by counsel, chapter 7 trustee for Delta Career

Education Corporation (the "**Debtor**" and collectively with its 13 direct and indirect subsidiaries

_____

Vernon E. Inge, Jr. (Va. State Bar No. 32699)
Corey S. Booker (Va. State Bar No. 73419)
Robert N. Drewry (Va. State Bar No. 91282)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:        804.977.3301
Facsimile:        804.977.3291
E-Mail:           vinge@wtplaw.com
E-Mail:           cbooker@wtplaw.com
E-Mail:           rdrewry@wtplaw.com
*Special Litigation Counsel for Harry Shaia, Jr., Chapter 7 Trustee*

who are debtors in this jointly administered case, the "**Debtors**"),[1] by and through his special litigation counsel, asserts the following claims against the following defendants: R. David Andrews, Nicholas A. Orum, Willard E. Lynn, Joseph A. Kennedy, III, John P. Olsen, Andrew J. Meyers, Timothy J. Ryder, Bill Nance, Kevin A. Smith, and Charles P. Brissman (collectively, the "**Defendants**").

**Procedural Background**

1.      This bankruptcy case was commenced by the Debtors filing of voluntary petitions for relief under Chapter 7 of the Bankruptcy Code on July 26 and 27, 2018 (the "**Petition Date**").

2.      The Court entered an Order [D.N. 18] on August 1, 2018, providing for the joint administration of the Debtors' bankruptcy cases (collectively and as jointly administered, the "**Bankruptcy Case**").

**Jurisdiction and Venue**

3.      The Trustee brings this action pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), sections 105, 502, 544, 547, 548 and 550 of Title 11 of the United State Code (the "**Bankruptcy Code**"), and other applicable federal and state law.

---

[1] In addition to Delta Career Education Corporation, the following 13 related entities filed chapter 7 bankruptcy cases: Academy of Court Reporting, Inc. (Case No. 18-33819); Atlantic Coast Colleges, Inc. (Case No. 18-33820) Berks Technical Institute, Inc. (Case No. 18-33821); Creative Circus, Inc. (Case No. 18-33814); Delta Educational Systems, Inc. (Case No. 18-33818); McCann Education Centers, Inc. (Case No. 18-33828); McCann School of Business and Technology, Inc. (Case No. 18-33825); Miller-Motte Business College, Inc. (Case No. 18-33827); National Career Education, Inc. (Case No. 18-33829); Palmetto Technical College, Inc. (Case No. 18-33801); Piedmont Business Colleges, Inc. (Case No. 18-33830); Southwest

2

4.      This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

5.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Nature of the Action**

6.      The Trustee brings this action to recover damages arising out of Defendants' prepetition breaches of their respective fiduciary duties, civil conspiracy, and preferential and fraudulent transfers made by the Debtors.

7.      Prior to this Bankruptcy Case and the closure of their business, the Debtors were engaged in the business of for-profit, post-secondary, career-oriented education. The Debtors operated 35 ground campuses, four online programs, 16 commercial drivers' license locations, and nine international truck driving schools. The Debtors' business was organized across 10 brands throughout the country.

8.      This action arises out of and relates to, among other things, a transaction on January 18, 2018 (the "**Ancora Transaction**"), pursuant to which Delta Career Education Corporation (the "**Debtor Holding Company**"), and its subsidiary companies sold certain assets to Ancora Intermediate Holdings, LLC ("**Ancora**"). It also arises out of and relates to the subsequent closure of the Debtors' schools following the Ancora Transaction.

9.      The substance of the Ancora Transaction involved two parts. First, Ancora would acquire certain of the Debtors' schools and continue to operate those schools as one of Ancora's

---

Business Colleges, Inc. (Case No. 18-33831); The Miami-Jacobs Business College Company (Case No. 18-33826).

schools (the "**Good Schools**").[2] Second, Ancora agreed to provide certain services to the Debtors

to teach-out and wind-down the Debtors' schools it was not acquiring (the "**Bad Schools**") by

the end of the Spring 2018 semester.[3]

10.     Neither part of the Ancora Transaction benefited the holders of substantial claims

against the Debtors. Instead, the consummation and implementation of the Ancora Transaction

benefited the Defendants who served on the Boards of Directors of: (i) the Debtor Holding

Company (the "**Debtor Holding Company Board**"), (ii) the Debtor Operating Company, Delta

Education Systems, Inc. ("**DESI**")(the "**DESI Board**"), and (iii) the Debtor Subsidiary

Companies[4] (the "**Debtor Subsidiary Boards**"), and/or as officers of the Debtor Holding

Company, DESI, or the Debtor Subsidiary Companies.

11.     Following the closing of the Ancora Transaction, Ancora effectively controlled all

aspects of the teach-out and wind-down of the Bad Schools, including all of the Debtors'

financial and other management and operational functions. The remaining officers of the Debtor

Holding Company and DESI were mere figureheads who – at least in some cases – received

---

[2] The Good Schools were the following schools and locations: (i) BTI – Wyomissing, PA, (ii) Creative Circus – Atlanta, GA; (iii) McCann School of Business & Technology – Allentown, PA, Lewisburg, PA, Monroe, LA, Shreveport, LA; (iv) Miller-Motte Technical College – Augusta, GA, Chattanooga, TN, Columbus, GA, Conway, SC, Macon, GA, Charleston, SC; (v) Miller-Motte College – Cary, NC, Fayetteville, NC, Jacksonville, NC, Raleigh, NC, Wilmington, NC, Dallas, TX, Sunland Park, NM.

[3] The Bad Schools were the following schools and locations: (i) McCann School of Business and Technology, Inc. – Hazelton, Carlisle, Dickson City and Wilkes-Barre, PA; (ii) The Miami-Jacobs Business College Company – Columbus, Dayton, Independence and Troy, OH; and (iii) Miller-Motte Business College, Inc. – Lynchburg and Roanoke, VA; Madison and Clarksville, TN.

[4] The Debtor Subsidiary Companies are made up all the Debtors except the Debtor Holding Company and DESI.

substantial compensation in return for which they provided no services of any value to the Debtors.

12.    After the Ancora Transaction and wind-down, the Debtors were left without an operating business and no business possibilities, very few assets, over $19 million in purported secured debt, and over $42 million[5] in unsecured claims. In contrast, after the Ancora Transaction, the defendant directors of the Debtor Holding Company Board, the DESI Board, and the defendant officers of the Debtor Holding Company and DESI had protected themselves with a substantial insurance policy, a release of any potential personal liability with the U.S. Department of Education ("**DOE**"), and in some cases, substantial compensation and bonus payments on the way out the door.

**The Parties**

13.    The Trustee was appointed interim trustee in the Bankruptcy Case on July 27, 2018, and continues to serve as Trustee in this Bankruptcy Case. [D.N. 6].

14.    On May 9, 2019, the Trustee engaged Whiteford, Taylor & Preston as special litigation counsel for the Bankruptcy Case ("**Special Litigation Counsel**"). Among other things, the Trustee engaged Special Litigation Counsel to investigate potential claims and causes of action belonging to the Debtors' bankruptcy estates and to prosecute the meritorious claims and causes of action.  [D.N. 91].

15.    Joseph A. Kennedy, III ("**Kennedy**") is an individual residing in the Commonwealth of Virginia. Kennedy served on the Debtor Holding Company Board from at

---

[5] This amount is based only on the Trustee's analysis of the claims register for all of the Debtors' cases. It excludes claims that were filed in multiple cases, such as the claims of Ancora and Field Point Agency Services, Inc. ("**Field Point**").

least 2008 to and through the Petition Date. Kennedy was also a member of the DESI Board of Directors at the Petition Date. Kennedy also served as Chief Executive Officer of the Debtor Holding Company from 2006 to 2008. At all times material hereto, Kennedy played an instrumental role in directing the Debtors' affairs including the Ancora Transaction which caused damage to the Debtors.

16.     R. David Andrews ("**Andrews**") is an individual residing in the state of California. Andrews served on the Debtor Holding Company's Board from at least 2008 to and through the Petition Date. Andrews is also the Chief Executive Officer and Managing General Partner of Gryphon Investors, Inc. ("**Gryphon**"). At all times material hereto, Andrews played an instrumental role in directing the Debtors' affairs including the Ancora Transaction which caused damage to the Debtors.

17.     Nicholas A. Orum ("**Orum**) is an individual residing in the state of California. Orum served on the Debtor Holding Company Board from at least 2008 to and through the Petition Date. Orum was also a member of the DESI Board of Directors at the Petition Date. Orum is also the President of Gryphon. At all times material hereto, Orum played an instrumental role in directing the Debtors' affairs including the Ancora Transaction which caused damage to the Debtors.

18.     Williard E. Lynn ("**Lynn**") is an individual residing in the state of California. Lynn served on the Debtor Holding Company Board from at least 2008 to and through the Petition Date. Lynn was also a member of the DESI Board of Directors at the Petition Date. Lynn is also a Partner and Executive Vice Chairman of Executive Advisory Board of Gryphon.

At all times material hereto, Lynn played an instrumental role in directing the Debtors' affairs including the Ancora Transaction which caused damage to the Debtors.

19.    John P. Olsen ("**Olsen**") is an individual residing in the Commonwealth of Virginia. Olsen served on the Board of Directors for the Debtor Holding Company from at least 2013 to and through the Petition Date. Olsen served as Chief Executive Officer and President of the Debtor Holding Company from 2013 until 2018. Olsen also served as a Director of each of the Debtor Holding Company's subsidiary companies (with the exception of DESI) on the Petition Date. At all times material hereto, Olsen played an instrumental role in directing the Debtors' affairs including the Ancora Transaction which caused damage to the Debtors.

20.    Andrew J. Meyers ("**Meyers**") is an individual residing in the state of California. Meyers served on the Board of Directors for the Debtor Holding Company from at least 2014 through 2018. While serving on the Board of Directors for the Debtor Holding Company, Meyers was a Partner at Gryphon. At all times material hereto, Meyers played an instrumental role in directing the Debtors' affairs including the Ancora Transaction which caused damage to the Debtors.

21.    Timothy J. Ryder ("**Ryder**") is an individual residing in the state of Ohio. Ryder served on the Board of Directors for DESI and the Debtor's subsidiary companies within the year prior to the Petition Date. Ryder was also Interim Chief Financial Officer for DESI and the Debtor's subsidiary companies. At all times material hereto, Ryder played an instrumental role in directing the Debtors' affairs including the Ancora Transaction which caused damage to the Debtors.

22.    Bill Nance ("**Nance**") is an individual residing in the state of Texas. Nance served on the Board of Directors for DESI and the Debtor's subsidiary companies within the year prior to the Petition Date. While serving on the Board of Directors for DESI, Nance was Vice President for DESI and the Debtor's other direct and indirect subsidiary companies. At all times material hereto, Nance played an instrumental role in directing the Debtors' affairs including the Ancora Transaction which caused damage to the Debtors. Ancora hired Nance in 2018 after the Ancora Transaction.

23.    Kevin A. Smith ("**Smith**") is an individual residing in the state of Texas. Smith served on the Board of Directors for DESI and the Debtor's other direct and indirect subsidiary companies within the year prior to the Petition Date.  While serving on the Board of Directors for DESI, Smith was Treasurer of DESI and the Debtor's subsidiary companies. At all times material hereto, Smith played an instrumental role in directing the Debtors' affairs including the Ancora Transaction which caused damage to the Debtors.

24.    Charles P. Brissman ("**Brissman**") is an individual residing in the state of Illinois. Brissman served on the Board of Directors for DESI and the Debtor's other direct and indirect subsidiary companies within the year prior to the Petition Date. While serving on the Board of Directors for DESI, Brissman was the Secretary and the Debtor's subsidiary companies. Brissman also served as general counsel to the Debtors.  At all times material hereto, Brissman played an instrumental role in directing the Debtors' affairs including the Ancora Transaction which caused damage to the Debtors.

**Factual Background**

*The Debtors' Corporate Structure*

25.     Prior to this Bankruptcy Case and the closure of their business, the Debtors were engaged in the business of for-profit, post-secondary, career-oriented education. The Debtors operated 35 ground campuses, four online programs, 16 commercial drivers' license locations, and nine international truck driving schools. The Debtors' business was organized across 10 brands throughout the country.

26.     Kennedy founded DESI in the late 1990s in Virginia Beach, Virginia. The company grew to include several schools with locations in Georgia, Louisiana, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee and Virginia.

27.     In or about 2006, Gryphon, a private equity firm based in San Francisco, California, acquired DESI and its subsidiaries through a Delaware holding company called Gryphon Colleges Corporation ("**GCC**") (the "**Gryphon Acquisition**"). The Gryphon Acquisition merged DESI and its 16 accredited career colleges with National Career Education, Inc. ("**NCEI**"), a subsidiary of GCC, which had four campuses.

28.     At or near the time of the Gryphon Acquisition, GCC changed its name to Delta Career Education Corporation (previously defined as the "**Debtor Holding Company**").

29.     Following the Gryphon Acquisition, DESI had the following subsidiary companies: Creative Circus, Inc. ("**Creative Circus**"), Berks Technical Institute, Inc., McCann School of Business and Technology, Inc., Atlantic Coast Colleges, Inc., McCann Educations Centers, Inc., The Miami-Jacobs Business College Company, Academy of Court Reporting, Inc., Miller-Motte Business College, Inc., Palmetto Technical College, Inc., and Piedmont Business

Colleges, Inc. Only one debtor is a subsidiary of NCEI: Southwest Business Colleges, Inc. (collectively, all of the Debtors listed in this paragraph, with the exception of DESI, shall be referred to as the "**Subsidiary Debtors**").

*The Debtors' Operations*

30.     Following the Gryphon Acquisition, Gryphon controlled and operated the Debtor Holding Company, DESI, NCEI, and the Subsidiary Debtors collectively as one of its portfolio companies. Gryphon's Partners served on the Debtor Holding Company Board and held a majority of the seats on the Debtor Holding Company Board at all times after the Gryphon Acquisition.

31.     Similarly, GCC, and subsequently the Debtor Holding Company, entered into an Advisory Agreement pursuant to which Gryphon Advisors, LLC ("**Advisors**") provided advice to the Debtor Holding Company Board and management "regarding corporate and financial strategy, potential acquisitions, the financial management of the Company and other issues." Pursuant to the Advisory Agreement, the Debtor Holding Company was obligated to pay fees to Advisors for its services.

32.     During the five-year period before the Petition Date, the Debtors paid Advisors $349,202.47 in consulting fees.

33.     On or about October 2007, the Debtors hired Alan Sussna ("**Sussna**") as President and CEO of the Debtor Holding Company. Sussna was appointed to the Debtor Holding Company Board in February 2008.

34.     During Sussna's almost-five-year tenure, the Debtor Holding Company, DESI, and the Subsidiary Debtors grew substantially. As of 2017, the Debtors had 43 campuses, plus online "campuses" across its ten brands of schools.

35.     A substantial part the Debtors' revenue came from the federal government in the form of financial aid for their students.

36.     Title IV ("**Title IV**") of the Higher Education Act of 1965, as amended, 20 § 1070, *et. seq.* (the "**HEA**") established various student loan and grant programs, including but not limited to, the Federal Pell Grant Program ("**Pell**"), the Federal Family Education Loan Program ("**FFELP**"), and the Federal Direct Loan Program ("**FDLP**") (collectively "**Title IV Program Funds**"). In order to receive Title IV Program Funds, the Debtors had to comply with specific provisions of HEA and the related DOE regulations. *See* 34 CFR § 668.14.

37.     Among other things, the Debtors were required to maintain certain financial metrics to demonstrate that the Debtors were financially responsible. 20 U.S.C. § 1099c, 34 CFR § 668.15.    As part of the financial responsibility requirements under the HEA and its corresponding regulations, the Secretary of Education has authority to require financial guarantees from institutions and individuals who exercise substantial control over such institutions and/or to require individuals who exercise substantial control over such institution to assume personal liability for financial losses to the Federal Government, student assistance recipients, and other program participants for funds under Title IV.  20 U.S.C. § 1099c.

38.     Beginning in 2007, the DOE had determined the Debtors were not financially responsible.  It only allowed the Debtors to continue to receive Title IV Program Funds under a provisional certification. In connection with such provisional certification, the DOE required the

Debtor Holding Company to maintain a letter of credit representing 15% of the aggregate amount of Title IV Program Funds received by the Debtors during their most recently ended fiscal year, with the amount adjusted annually. DOE also placed the Debtors on a Heightened Cash Monitoring payment method to provide additional oversight of its cash management.

39.     Each year that DOE determined the Debtors were not financially responsible was another year that the Secretary could decide to hold Gryphon, the members of the Debtor Holding Company Board, and the members of the DESI Board personally liable for the Debtors' financial losses.

### *The Debtors' Debt Structure*

40.     The Debtors also maintained substantial debt as part of their operations.

41.     Beginning in 2006, DESI was the borrower to a complex loan structure in which a group of lenders (the "**Original Lender Group**") agreed to loan DESI: (i) maximum term loan commitments in the amount of $55 million; (ii) maximum revolving loan commitments in the amount of $20 million; and (iii) the revolving loan commitments that could be used for the issuance of letters of credit, not to exceed $12 million (collectively, the "**Loans**"). General Electric Capital Corporation was the original administrative agent for the Original Lender Group and was replaced by Antares Holdings, LP (the "**Original Agent**").

42.     The Debtor Holding Company and the Subsidiary Debtors are parties to guaranty agreements with respect to the Loans. The Debtors are also parties to a security agreement in favor of the Original Lender Group.

43.     In November 2016, DESI, the Debtor Holding Company, the Subsidiary Debtors, and the Original Lender Group through the Original Agent entered into a Restructuring

Agreement and Amended and Restated Credit Agreement. The agreements provided that the outstanding principal on the term loan was $13,603,284.39 with $455,146.57 in accrued interest. The agreements provided a maximum revolving loan commitment in the amount of $36,422,153.75; and an existing letter of credit from the Agent in favor of DOE in the amount of $35,556,935.00.

<u>*Delta Begins To Have Financial Difficulties*</u>

44.     Before the Ancora Transaction, certain of the Debtors experienced financial difficulties. For example, the Debtor Holding Company Board minutes from a December 2, 2014 meeting note the Debtors' financial documents showed "expected shortfalls in revenue (approximately $18 million) and in [EBITDA] (approximately $10 million) compared to the [Debtors'] original fiscal year 2015 budget" and describe "breaches of certain financial covenants in [the Debtors'] senior debt agreements that [the Debtors] expected to occur as of December 31, 2014 and the corresponding suspension of cash interest payments on [the Debtors'] subordinated debt and payment of management fees that would result."

45.     From at least that point on, December 2, 2014, the Defendants were on actual notice that the Debtors were in the zone of insolvency.

46.     Beginning in at least 2016, the Debtor Holding Company, led by Gryphon, was trying to refinance its business or sell it.

47.     In addition to its financial difficulties, in September 2016, the accreditor for most of the Debtors' schools, Accrediting Council for Independent Colleges and Schools ("**ACICS**"), received a notice of default from the DOE.  ACICS's appeal was denied in December 2016. As a

result, all of the Debtors' schools accredited under ACICS had eighteen months (through May 2018) to find a new accreditor in order to continue participating in federal student aid programs.

48.     In July 2017, the Debtors learned another accrediting agency, Accrediting Council for Continuing Education and Training ("**ACCET**"), denied its request to be accredited through that agency. At this point, the Debtors' only option was to merge with another accredited school or to close.[6]

49.     Closing presented its own set of challenges. DOE regulations require institutions to submit a teach-out plan to its accrediting agency before closing. 34 CFR § 6002. A teach-out is a process in which a school engages in an orderly closure. The school no longer accepts new students and is required to make sure that any student that did not graduate before closure had another school to complete his or her education. Teach-outs are expensive because as the number of students decreases, so does the level of Title IV Program Funds and other tuition paid to a school, while operating costs still have to be paid.

50.     Moreover, if the Debtors simply walked away from their schools without an orderly wind-down, the Debtors would be liable to the federal government for all tuition received for students who did not graduate. The DOE also would draw on the Debtors' letters of credit to fund the debt, liabilities or reimbursable costs, including those associated with the teach-out. Finally, if the Debtors did not have enough cash collateral to cover their letters of credit, the DOE could require Gryphon and/or members of the Debtor Holding Company Board members

---

[6] The Debtors could not file a chapter 11 reorganization and continue to receive Title IV Program Funds. An institution who files for relief in bankruptcy is ineligible to receive Title IV Program Funds. 34 CFR § 600.7.

the DESI Board, and Subsidiary Debtors to assume personally liability for the financial losses related to the closure.

*The Ancora Transaction*

51.     The Debtor Holding Company began discussions with Ancora in the spring of 2017 regarding a sale of the Debtors' business.

52.     In May 2017, the Debtors had an immediate need for $3 million in liquidity and STVT-AAI Education, Inc. ("**STVT**"), an Ancora affiliate, agreed to make a short-term loan that was secured by a lien that took priority over the secured debt. The short-term loan was repaid in July 2017. The parties agreed to the short-term loan, in part, because Ancora had provided a letter of intent to purchase a substantial portion of Delta's assets.

53.     Throughout the summer and fall of 2017, the Debtors, with substantial input from Gryphon, negotiated the terms of their transaction with Ancora and the Original Lender Group and their respective counsel. Ancora conducted due diligence that included a review of documents and campus visits.

54.     The parties generally agreed that the Debtors would sell some of their assets and liabilities to Ancora, but other liabilities and assets would remain with the Debtors.  Ancora would assist with a teach-out of certain of the Debtors' schools.  Following the completion of the teach-out, the parties contemplated putting the Debtors into Chapter 7 bankruptcy in a "favorable jurisdiction."

55.     The original asset purchase agreement contained a "no-shop" provision that prohibited the Debtors from marketing or trying to sell the Bad Schools that Ancora did not purchase.

56.     The original asset purchase agreement was executed in October, 2017; however, the DOE rejected the proposed acquisition. Specifically, the DOE rejected the number of schools Ancora proposed to purchase.

57.     Accordingly, the parties modified the acquisition and in January 2018, executed the Amended & Restated Asset Purchase Agreement (the "**Asset Purchase Agreement**"), this time with Ancora purchasing fewer schools. The Ancora Transaction required approval from the applicable accrediting agencies, the DOE, and the Original Lender Group.

58.     In addition to Ancora's acquisition of the Good Schools, the Asset Purchase Agreement required Ancora to provide services to the Debtors to teach-out and wind-down the Bad Schools through the end of the spring 2018 semester.

59.     As consideration for the Ancora Transaction, Ancora agreed to pay for some of the costs of winding down the Bad Schools and to assume certain liabilities of the Debtors. Ancora did not agree to pay the Debtors any cash or other funds other than the funds for the wind-down.

60.     At the closing of the Ancora Transaction, Ancora paid a total of $5,000,008.00 to fund the wind down and teach out.  Of that amount, $4,350,538.00 was deposited into an escrow account that funded the wind down and teach-out of the Bad Schools. The remaining $649,470.00 was used to pay closing expenses.

61.     The Asset Purchase Agreement also required a net working capital adjustment (the "**NWC Provision**"). This provision allowed for an adjustment of the Debtor's proposed net working capital figure versus Ancora's actual net working capital figure. The net working capital

was calculated by subtracting the value of the acquired liabilities from the value of the assets that Ancora purchased.

62.     A net working capital adjustment is typically used in transactions to make sure a buyer actually receives the capital it paid for as part of the transaction. In definitive acquisition agreements, parties routinely agree on a target amount of the net working capital, which is estimated at closing and then followed by a "true-up," an actual computation of net working capital made shortly after closing which leads to a corresponding adjustment in the purchase price. If the net working capital is below the target, the seller pays back a portion of the purchase price. If the net working capital is above the target, then the buyer pays additional consideration to the seller.

63.     In the context of the Ancora Transaction, the NWC Provision does not make sense. Ancora did not pay a purchase price for the Debtors' assets so there was no corresponding adjustment to be made to the purchase price.  Likewise, although the Asset Purchase Agreement identifies a net working capital target of $0, it does not appear that the target is used for any transaction value purposes (specifically a purchase price adjustment), rather it simply provides for a comparison of the estimated NWC and the actual working capital, presumably only for transaction accounting purposes.

64.     The Asset Purchase Agreement also created an escrow fund that purpose was to pay an adjustment based on the NWC Provision (the "**Surety Bond Escrow Account**"). The Surety Bond Escrow Account was funded with funds that the Debtors had provided as cash collateral to certain surety companies. As those surety companies cancelled bonds and returned cash collateral to the Debtors, it was deposited into the Surety Bond Escrow Account.

65.      In connection with the Ancora Transaction and pursuant to the Commitment and Agency Assignment and Acceptance, the Original Lender Group agreed to assign the purported outstanding debt to Marblegate Special Opportunities Master Fund, L.P. ("**Marblegate**") and to pay Marblegate $2 million as part of the assignment (the "**Loan Assignment**"). As a result, the Original Lender Group transferred the purported outstanding loan obligations and the cash collateral securing the letters of credit to Marblegate. The Original Lender Group also assigned all of their right, title, and interest in their security interests in the Debtors' property to Marblegate. The Commitment and Agency Assignment and Acceptance also appointed Field Point as the agent for Marblegate.

66.      At the time of the Loan Assignment, $15,505,978.94 in principal and $31,436.78 in accrued interest were purportedly outstanding on the Term Loan. The Revolving Loan Commitment at the time of assignment was $35,556,935, with $0 outstanding. Additionally, the Original Lender Group transferred $11,561,198.90 to Marblegate that the Original Lender Group had held as cash collateral security for the letters of credit (the "**Cash Collateral**").

67.      Simultaneously with the closing of the Ancora Transaction and the Loan Assignment, the DOE cancelled the Debtors' letters of credit.

68.      Upon information and belief, Marblegate did not apply the $2 million it received from the Original Lender Group or the Cash Collateral belonging to the Debtors to any of the Debtors' existing purported debt obligations. Upon information and belief, Marblegate has used the Cash Collateral for its own purposes or as security for Ancora's obligations. As a result, the Cash Collateral was no longer necessary to secure the Debtors' purported obligations to Marblegate.

69.     As a result of the Ancora Transaction and Loan Assignment, at the Petition Date,

the Debtors purportedly owed Marblegate $15,533,372.16 pursuant to the loan documents (the

"**Marblegate Claim**") and Ancora $11,214,000.00 pursuant to the NWC Provision (the "**Ancora**

**Claim**"). (Case No. 18-33822, Claims Nos. 72-1 and 69-1).[7]

70.     In essence, the Ancora Transaction was backwards. It resulted in little or no value

to the Debtors, notwithstanding the substantial value in Creative Circus alone. The Debtors *paid*

Marblegate and Ancora $6,561,190.00[8] in cash, plus transferred all of their accounts receivable

to Ancora and incurred an additional $11,214,000.00 in purported debt to Ancora.

71.     At a minimum, the amount of consideration Ancora paid for the Ancora

Transaction was grossly inadequate. Further, Field Point, Marblegate, and Ancora took the Cash

Collateral – $11.5 million of cash that belonged to the Debtors – for no consideration at all and

converted that $11.5 million to their own use.

72.     The true purchase price of the Ancora Transaction is shocking, given the fact that

in the spring of 2017, brokers believed that only one of the Debtors' schools, Creative Circus,

was worth $9 million to $12 million.

73.     Likewise, in an e-mail later that year, on September 27, 2017, Olsen told

representatives of the Agent, Ancora's financial officers, and Meyers that the combined EBITDA

of the schools and the campuses that Ancora proposed to acquire was $35 million.  Olsen stated

in "normal times, you could easily attach a 6-7X multiple to that EBITDA to get to a valuation

---

[7] Marblegate and Ancora filed the same proof of claim in all 14 of the Debtors' cases. This reference is only to the claims field in the Debtor Holding Company's case.

[8] This amount is calculated by subtracting the $5,000,008 Ancora paid for the wind-down expenses from the $11,561,198.00 in Cash Collateral transferred to Marblegate.

north of $200M. Creative Circus, which, on its own could fetch $9-$12M based on what we heard from Brokers a couple months ago."[9]

74.     Neither the Debtor Holding Company Board, the DESI Board, nor the Debtor Subsidiary Boards held a single meeting to discuss the Ancora Transaction.

75.     Neither the Debtor Holding Company Board, the DESI Board, nor the Debtor Subsidiary Boards prepared adequate minutes from any board meeting discussing the Ancora Transaction.

76.     Instead, Debtor Holding Company Board, and the Debtor Subsidiary Boards simply approved the Ancora Transaction through unanimous written consents.

77.     Further, and even more troubling, the Debtor Holding Company Board and the Debtor Subsidiary Boards consents for the January 2018 Ancora Transaction are the unanimous written consents executed in October 2017 for the original asset purchase agreement. This demonstrates that after the DOE denied the transaction contemplated by the original asset purchase agreement, those boards did not take any action to inform itself of the amended terms in the ultimate transaction and simply relied on its approval of the original transaction.

78.     The ultimate nature of the Ancora Transaction demonstrates the Debtor Holding Company Board's and the Debtors Subsidiary Board's failure to be reasonably informed of all the necessary information in approving the Ancora Transaction.

79.     For example, the Debtor Holding Company and the Debtor Subsidiary Boards failed to negotiate for an increase in the consideration to an amount that would match the

---

[9] The Trustee recognized that the number of schools Ancora ultimately acquired decreased from the proposal when this e-mail was written, but even taking that decrease into account, the fact

Debtors' own internal valuations of their business or any amount for that matter, either because it did not know the true value or it did not care.

80.     The Debtor Holding Company Board and the Debtor Subsidiary Boards also failed to understand the changes to the NWC Provision between the October 2017 asset purchase agreement and the Asset Purchase Agreement.  As a result, the NWC Provision remained in the Asset Purchase Agreement despite the fact that it was wholly inapplicable to the transaction and allowed Ancora another opportunity to seize additional assets of the Debtors without paying for them.

81.     The Debtor Holding Company Board and the Debtor Subsidiary Boards also failed to inform itself of how it was giving more of its valuable assets to Ancora through the Surety Bond Escrow Account.  The Asset Purchase Agreement provides that the Surety Bond Escrow Account would fund an adjustment required under the NWC provision regardless of whether the adjustment was in favor of the Debtors or Ancora. Thus, the Debtors effectively agreed ***to pay*** Ancora after they had sold their assets to it.[10] Again, the Debtor Holding Company Board did not try to negotiate a different way to pay an adjustment required under the NWC provision.

82.     Finally, the Debtor Holding Company Board and the Debtor Subsidiary Boards also failed to inform itself that the consequence of the Loan Assignment and cancellation of its

that Delta ***paid*** Ancora $6.5 million to purchase the assets nowhere near the proposed EBITDA, much less a multiple of EBITDA.

[10] This Section does provide that, in certain circumstances, 50% of the cash proceeds in the Surety Bond Escrow Account would be paid the Debtors. Field Point has asserted a claim to the Debtors' amount of cash in the Surety Bond Escrow Account due to the outstanding debt allegedly owed to Marblegate, which is secured by all of the Debtors' assets. [See D.N. 99].

letter of credit would be that Field Point and Marblegate could take $11.5 million of the Debtors' money.

83.    Instead of informing itself how to get the most value out of the Debtors' assets and attempting to get that value, the Debtor Holding Company Board, the Debtor Subsidiary Boards, and Gryphon took care of themselves and their professionals.

84.    As part of the Asset Purchase Agreement, the members of the Debtor Holding Company Board and the Debtor Subsidiary Boards agreed that insurance policies for "executive risk" should be purchased with the Debtor's diminishing funds. Accordingly, on February 27, 2018, DESI paid a premium of $1,790,396.00 that would provide coverage for the Debtor Holding Company's and the Debtor Subsidiary Companies' Directors' and Officers' actions following the Ancora Transaction and during the wind-down period.

85.    Knowing that the DOE could impose personal liability on the members of the Debtor Holding Company Board and DESI Board on account of the Debtors' liabilities to the DOE, the Debtor Holding Company Board and Gryphon ensured: (i) the Debtors' liability on the letter of credit in favor of the DOE was terminated and (ii) all other risk related to the Title IV Program Funds was shifted to Ancora so that their own risk of personal liability to the DOE was also eliminated.

86.    In addition, Olsen and Brissman each made sure they each received their large bonuses and severances before any bankruptcy proceedings were commenced by or against the Debtors.

87.    On the day before the Ancora Transaction closed, Olsen amended the severance in his employment contract to be renamed a "retention bonus" to attempt to protect it from a

bankruptcy trustee seeking to avoid the payment of severance following any bankruptcy proceedings commenced by or against the Debtors.

*The Wind-Down Period*

88.    The Ancora Transaction closed on January 18, 2018 (the "**Closing Date**").

89.    Following the Closing Date, Ancora took over all operations of the Good Schools. During its operations of the Good Schools, Ancora utilized some of the Debtors technology and licenses that it did not pay for in the Asset Purchase Agreement. For example, in July 2017, the Debtors paid a deposit for its annual renewal for software integration services from Boomi, a division of Dell (the "**Boomi Software**"). The Debtors used the services until the Closing Date, and Ancora used the services following the closing date. In August 2018, Ancora renewed the account for an additional year and simply substituted its name as the party renewing the services. Ancora never paid the Debtors for the use of the Boomi Software from January 2018 to August 2018.

90.    Following the Closing Date, the Debtors were primarily responsible for teaching-out the Bad Schools. Ancora provided support to the Debtors through its financial aid, student services and accounting department pursuant to the Transition Services Agreement and Wind-down Agreement.

91.    Likewise, following the Closing Date, all the Debtors' accounting records necessary to teach-out the Bad Schools were transferred to Ancora.

92.    Ancora hired a small group of the Debtors' employees to work for it. These employees were in the financial affairs and marketing departments. As a result, the Debtors'

bank accounts were controlled by both Ancora and the Debtors' employees after the Closing Date.

93.    After the Closing Date, the Debtors employed only a skeleton crew of employees for their operations. With limited exceptions mainly at the individual school level, these employees – namely Olsen and Brissman – provided no value to the Debtors despite receiving substantial compensation from the Debtors.

94.    As of the Closing Date, the Company amended both Olsen and Brissman's employment agreements to relieve them of their duties as executives and officers of the Company. Per his amended employment agreement, Olsen was required to provide advice to the Debtor Holding Company Board or others providing services to the Debtors regarding the wind-down. Per his amended employment agreement, Brissman was retained to advise the Debtor Holding Company Board and the Debtors with respect to historical matters relating to the management and administration of the Debtors.

95.    After the Closing Date, Martina Hansen ("**Hansen**") assumed the role of the Debtor Holding Company's Chief Executive Officer. The Debtor Holding Company Board, however, did not officially appoint Hansen to the job until May 30, 2018, and only after Hansen requested the appointment in order close the Debtors' bank accounts.

96.    Hansen was the primary contact for the administrator of each Bad School and worked with each Bad School to make sure the teach-out was completed as required by law.

97.    Hansen relied upon both Meyers, on behalf of the Debtor Holding Company Board, as well as Ancora's CEO, Michael Zawisky, to direct her actions during the wind-down, including obtaining approval from them for payment of certain expenses.

98.    Neither Olsen nor Brissman provided any direction or guidance to Hansen, the Debtors, or the Debtor Holding Company Board during the wind-down period.

99.    The Bad Schools were "taught out" over the spring 2018 semester.

100.    Upon information and belief, during the period of 2014-2018, Olsen also served as the Chief Executive Officer and Executive Chairman of Envision Experience ("**Envision**"), a company that is unrelated to the Debtors.

101.    Upon information and belief, Gryphon was the equity sponsor of Envision from August 2012 through August 2018.

102.    Upon information and belief, Olsen oversaw Envision's turnaround as executive chairman and its acquisition by another company in October, 2018.

103.    Olsen received $1,789,835.12 from the Debtors in the two years before the Petition Date in the form of salary, bonuses, and severance (the "**Olsen Transfers**").  Of that amount, Olsen received $1,002,335.06 within one year of the Petition Date ("**Olsen Preference Payments**") and $520,027.34 after the Closing Date. Olsen received a retention bonus of $240,000.00 on September 29, 2017 (right before the original transaction was supposed to close).

104.    Brissman received $617,269.64 from the Debtors in the two years before the Petition Date in the form of salary, bonuses, and severance (the "**Brissman Transfers**" and collectively with the Olsen Transfers, the "**Executive Transfers**"). Of that amount, Brissman received $ 367,269.50 within one year of the Petition Date and $126,884.82 after the Closing Date ("**Brissman Preference Payments**," and collectively with the Olsen Preference Payments, the "**Executive Preference Payments**"). Like Olsen, Brissman received a retention bonus of $125,000.00 on September 29, 2017 (right before the original transaction was supposed to close).

## COUNT I
### Breach of Fiduciary Duties

105.    The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

106.    As directors, the members of the Debtor Holding Company Board, the DESI Board, and the Debtor Subsidiary Boards owed fiduciary obligations to the Debtors. Specifically, the Debtor Holding Company Board, the DESI Board, and the Debtor Subsidiary Boards owed the Debtors the highest obligations of care, oversight, reasonable inquiry, supervision and informed decision-making.

107.    After the Debtors entered the zone of insolvency, as directors, the members of the Debtor Holding Company Board, the DESI Board, and the Debtor Subsidiary Boards also owed fiduciary obligations to the Debtors' creditors. Specifically, the Debtor Holding Company Board and the DESI Board owed the Debtors' creditors the highest obligations of care, oversight, reasonable inquiry, supervision and informed decision-making.

108.    Debtor Holding Company Board, the DESI Board, and the Debtor Subsidiary Boards failed to hold even one meeting in 2017 or early 2018 to consider the Ancora Transaction. Following the DOE's rejection of the original deal in October 2017, the Debtor Holding Company Board, the DESI Board, and the Debtor Subsidiary Boards did not hold any meetings to discuss the changes to the deal. In fact, the Debtor Holding Company Board, the DESI Board, and the Debtor Subsidiary Boards did not even execute a new consent for the final Asset Purchase Agreement and instead relied upon its unanimous consent in October 2017 to approve the Ancora Transaction in January 2018.

26

109.    The members of Debtor Holding Company Board, the DESI Board, and the Debtor Subsidiary Boards failed to take any action to inform themselves of the true terms and consequence of the Ancora Transaction including the actual value paid for the Good Schools and other assets sold. The members of Debtor Holding Company Board, the DESI Board, and the Debtor Subsidiary Boards failed to propose any terms that would reasonably compensate the Debtors for the assets sold.

110.    As a result, the Debtor Holding Company Board, the DESI Board, and the Debtor Subsidiary Boards allowed Ancora to loot the Debtors by paying nothing for the Good Schools and running up additional debt through the NWC Provision to be paid with the Debtors' funds in the Surety Escrow Account.

111.    Likewise, the Debtor Holding Company Board, the DESI Board, and the Debtor Subsidiary Boards failed to take any action to inform themselves of the true terms and consequence of the Loan Assignment and transfer of the Cash Collateral through the Commitment and Agency Assignment and Acceptance.  As a result, Debtor Holding Company Board, the DESI Board, and the Debtor Subsidiary Boards allowed Field Point and Marblegate to take the $11.5 million Cash Collateral.

112.    The Debtor Holding Company Board, the DESI Board, and the Debtor Subsidiary Boards Allowed the no-shop provision in the original agreement, which prohibited the Debtors from obtaining maximum value for the Bad Schools.

113.    The members of the Debtor Holding Company Board, the DESI Board, and the Debtor Subsidiary Boards breached their fiduciary duties by failing to exercise their duties in

good faith, in the best interest of the Debtors and its creditors, and with the care that an ordinarily

prudent person in a like position would have used under similar circumstances.

114.    The members of the Debtor Holding Company Board, the DESI Board, and the

Debtor Subsidiary Boards breached their fiduciary duties of loyalty and care by failing to

exercise the highest obligations of care, oversight, reasonable inquiry, supervision, and informed

decision-making, as described within the Complaint.

115.    As a direct and proximate result of the breaches by Debtor Holding Company

Board, the DESI Board, and the Debtor Subsidiary Boards of their of their fiduciary duties to the

Debtors, the Debtors suffered substantial damages including but not limited to, *inter alia*, the

loss of the Cash Collateral, the loss of substantial value of the Good Schools in the Ancora

Transaction, the loss of the funds in the Escrow Surety Account, and other damages for which

the Defendant directors are jointly and severally liable.

116.    As a direct and proximate result of the breaches by Debtor Holding Company

Board, the DESI Board, and the Debtor Subsidiary Boards of their of their fiduciary duties to the

Debtors' creditors, the Debtors' creditors suffered substantial damages for which the directors

are jointly and severally liable.

## COUNT II
**Breach of Fiduciary Duties**

117.    The Trustee incorporates by reference and realleges each and every allegation

contained in the foregoing paragraphs, as though fully set forth herein.

118.    The officers of the Debtor Holding Company, DESI, and Debtor Subsidiary

Companies owed fiduciary obligations to the Debtors. Specifically, the officers owed the Debtors

the highest obligations of care, oversight, reasonable inquiry, supervision and informed decision-making.

119.    After the Debtors entered the zone of insolvency, the officers the Debtor Holding Company, DESI, and Debtor Subsidiary Companies also owed fiduciary obligations to the Debtors' creditors. Specifically, the officers of the Debtor Holding Company, DESI, and Debtor Subsidiary Companies owed the Debtors' creditors the highest obligations of care, oversight, reasonable inquiry, supervision and informed decision-making.

120.    The officers failed to hold even one meeting in 2017 or early 2018 to consider the Ancora Transaction. Following the DOE's rejection of the original deal in October 2017, the officers did not hold any meetings to discuss the changes to the deal.  The officers did not even execute a new consent for the final Asset Purchase Agreement and instead relied upon its unanimous consent in October 2017 to approve the Ancora Transaction in January 2018.

121.    The officers failed to take any action to inform themselves of the true terms and consequence of the Ancora Transaction including the actual value paid for the Good School and other assets sold. The officers failed to propose any terms that would reasonable compensate the Debtors for the assets sold.

122.    As a result, the officers agreed and approved the Ancora Transaction which allowed Ancora to loot the Debtors by paying nothing for the Good Schools and running up additional debt through the NWC Provision to be paid with the Debtors' funds in the Surety Escrow Account.

123.    Likewise, the officers failed to take any action to inform themselves of the true terms and consequence of the Loan Assignment and transfer of the Cash Collateral through the

Commitment and Agency Assignment and Acceptance. As a result, the officers allowed Field Point and Marblegate to take the $11.5 million Cash Collateral and use it however they pleased.

124. The officers allowed the no-shop provision in the original agreement, which prohibited the Debtors from obtaining maximum value for the Bad Schools.

125. The officers breached their fiduciary duties by failing to exercise their duties in good faith, in the best interest of the Debtors and their creditors, and with the care that an ordinarily prudent person in a like position would have used under similar circumstances.

126. The officers breached their fiduciary duties of loyalty and care by failing to exercise the highest obligations of care, oversight, reasonable inquiry, supervision, and informed decision-making as described within the Complaint.

127. As a direct and proximate result of the breach by officers of their of their fiduciary duties to the Debtors, the Debtors suffered substantial damages including but not limited to, *inter alia*, the loss of the Cash Collateral, the loss of substantial value of Good Schools in the Ancora Transaction, the loss of the funds in the Escrow Surety Account, and other damages for which the Defendant directors are jointly and severally liable.

128. As a direct and proximate result of the breach by officers of their fiduciary duties to the Debtors' creditors, the Debtors' creditors suffered substantial damages for which the Defendant officers are jointly and severally liable.

## COUNT III
### Breach of Fiduciary Duties
*(Against Olsen only)*

129. The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

130.    As an officer and director, Olsen owed fiduciary obligations to the Debtors. Specifically, Olsen owed the Debtors the highest obligations of care, oversight, reasonable inquiry, supervision and informed decision-making.

131.    After the Debtors entered the zone of insolvency, Olsen also owed fiduciary duties to the Debtors' creditors. Specifically, Olsen owed the Debtors' creditors the highest obligations of care, oversight, reasonable inquiry, supervision and informed decision-making.

132.    For the last four years of his tenure as CEO for the Debtors, Olsen also worked as CEO and Executive Chairman for another company, Envision Experience.

133.    Olsen breached his fiduciary duties to the Debtors and the Debtors' creditors by failing to give his undivided time and attention to the Debtors and instead focused it on another company.

134.    Indeed, in the last year of his tenure for the Debtors, Olsen was also working on selling Envision, which sold eight months after the Closing Date.

135.    The Debtors paid Olsen at least $2,100,000.00 in salary from 2014 to 2018.

136.    As a direct and proximate result of Olsen's breach of fiduciary duties to the Debtors, the Debtors and the Debtors' creditors suffered substantial damages including, *inter alia*, the executive compensation paid to Olsen in an amount of $2,100,000.00, the loss of the Cash Collateral ($11.5 million), and the loss of substantial value of the sale of the Good Schools, for which Olsen is liable.

**COUNT IV**
**Breach of Employment Contract**
*(Against Olsen Only)*

137.    The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

138.    Olsen is a party to an Employment Agreement dated March 26, 2013 with the Debtor Holding Company (the "**Employment Agreement**").

139.    Pursuant to the Employment Agreement Olsen was prohibited from "accepting any other employment or perform[ing] other services for compensation or that interfere with Executive's employment or with his performance as President of the Company."

140.    For the last four years of his tenure as CEO for Debtor Holding Company, Olsen worked as Chief Executive Officer and Executive Chairman for another company, Envision.

141.    Olsen breached the terms of the Employment Agreement by accepting employment from Envision.

142.    Olsen breached the terms of the Employment Agreement by performing services for compensation for Envision.

143.    Olsen breached the terms of the Employment Agreement by performing services for Envision that interfered with his employment and performance as President of the Debtor Holding Company.

144.    As a direct and proximate result of Olsen's breach of the Employment Agreement, the Debtors suffered substantial damages including, *inter alia*, the executive compensation paid to Olsen in an amount of $2,100,000.00 in salary, the loss of $11.5 million in

Cash Collateral and the loss of substantial value of the sale of the Good Schools, for which Olsen is liable.

### COUNT V
### Civil Conspiracy
*(In the Alternative)*

145.    The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

146.    Ancora, STVT, Marblegate, Field Point, Andrews, Orum, Lynn, Kennedy, Olsen, Meyers, Ryder, Nance, Smith, and Brissman together, acted in concert and combination with one another to effectuate the Ancora Transaction, the assignment of the Cash Collateral, and the subsequent wind-down of the Debtors.

147.    The purpose of the combination among Ancora, STVT, Marblegate, Field Point, Andrews, Orum, Lynn, Kennedy, Olsen, Meyers, Ryder, Nance, Smith, and Brissman, was to defraud the Debtors' creditors by removing all valuable assets from the Debtors, including allowing Ancora, STVT, Marblegate, and Field Point to convert the Cash Collateral ($11,500,000.00), while at the same time protecting their own interests and lining their own pockets.

148.    The Debtors have been damaged as a direct and proximate result of the actions of the Defendants, including without limitation, the loss of valuable assets to pay their creditors, which has resulted in damages to be proven at trial.

**COUNT VI**
**Statutory Conspiracy under Va. Code §§ 18.2-499, -500**
*(In the Alternative)*

149.    The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

150.    Ancora, STVT, Marblegate, Field Point, Andrews, Orum, Lynn, Kennedy, Olsen, Meyers, Ryder, Nance, Smith, and Brissman, by acting in concert, participation, and combination with one another to transfer assets away from the Debtors and reach of the Debtors' creditors to themselves, effectuated the Ancora Transaction and the assignment of the Cash Collateral, defrauded the Debtors' creditors, and profited from this course of conduct. Thus, the Defendants have combined, associated, and conspired with the each other  and Ancora, STVT, Marblegate and Field to injure the Debtors in their reputation trade, business and profession, all in violation of Va. Code Ann. §§ 18.2-499 and 18.2-500.

151.    The unlawful acts of the conspiracy were to defraud the Debtors' creditors, obtain certain releases from liability and insurance protections for the Defendants' personal gain, to hinder, delay, or defraud the Debtors' creditors, and/or to allow Ancora or Marblegate to unlawfully possess or control funds, and convert property in which they were not authorized to possess or control, such as the Cash Collateral, with the purpose of willfully injuring the Debtors' business.

152.    The actions of the Defendants in furtherance of the conspiracy were undertaken willfully and with full knowledge of, but conscious disregard for, the rights and claims of the Debtors' creditors.

153.     The Debtors have been damaged by the actions of the Defendants, including without limitation, limitation, the loss of valuable assets to pay their creditors, which has resulted in damages to be proven at trial, which has resulted in damages to be proven at trial.

154.     As a matter of law, pursuant to Va. Code. § 18.2-500, the Debtors are entitled to recover three times its actual damages incurred, plus its attorneys' fees reasonably incurred in prosecuting this action.

## COUNT VII
**Avoidance of Transfers under 11 USC § 548 (a)(1)(A) and Va. Code § 55.1-400**
*(Against Olsen and Brissman only)*

155.     The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

156.     The Executive Transfers to Olsen and Brissman were transfers within the definition of 11 U.S.C. § 101 (54)(D)(i) or (ii).

157.     The Executive Transfers to Olsen and Brissman were transfers of property, or of an interest in property, of the Debtors to and/or for the benefit of Olsen and Brissman.

158.     The Debtors made the Executive Transfers with the knowledge that they would hinder creditors, and thus with the actual intent to hinder, delay and/or default the Debtors' creditors.

159.     Accordingly, the Executive Transfers constitute avoidable fraudulent transfers pursuant to Sections 548(a)(1)(A) of the Bankruptcy Code and Section 55.1-440 of the Virginia Code.

## COUNT VIII
### Avoidance of Transfers under 11 USC § 548 (a)(1)(B) and Va. Code § 55.1-401
*(Against Olsen and Brissman only)*

160.   The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

161.   The Executive Transfers to Olsen and Brissman were transfers within the definition of 11 U.S.C. § 101 (54)(D)(i) or (ii).

162.   At the time the Executive Transfers were made, Debtors were left with an unreasonably small amount of capital with which to conduct their business, as evidenced by the fact that the Debtors were in the process of closing down and selling off all schools and winding down operations.

163.   The Executive Transfers occurred while the Debtors were insolvent.

164.   The Executive Transfers were made to the benefit of insiders, under an employment contract, and were not made in the ordinary course of business.

165.   In exchange for the Executive Transfers, the Debtors received less than a reasonably equivalent value, because they were merely excessive payments to directors of a dying company.

166.   Accordingly, the Executive Transfers constitute avoidable fraudulent transfers pursuant to Section 548(a)(1)(B) of the Bankruptcy Code and Section 55.1-440 of the Virginia Code.

## COUNT IX
### Avoidance of Transfers under 11 USC § 547
*(Against Olsen and Brissman only)*

167.    The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

168.    The Executive Payments were transfers of property, or of an interest in property, of Debtors to and/or the benefit of Olsen and Brissman.

169.    Olsen and Brissman were each insiders of the Debtors at the time of the Executive Preference Payments.

170.    The Executive Preference Payments were made within one year of the Petition Date.

171.    The Executive Preference Payments were made on account of antecedent debts owed by the Debtors to the recipients of those payments before the transfers were made as set forth the in various employee contracts.

172.    The Executive Preference Payments were made while the Debtors were insolvent.

173.    The Executive Preference Payments allowed Olsen and Brissman to receive more than they would have received if the payments had not been made and they received payments of those debts to the extent provided by filing a claim in this Chapter 7 proceeding and the provision of the Bankruptcy Code.

174.    Accordingly, the Executive Preference Payments constitute avoidable preferential transfers pursuant to Section 547 of the Bankruptcy Code.

## COUNT X
### Recovery of Transfers Under 11 USC § 550
*(Against Olsen and Brissman only)*

175.    The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

176.    The Trustee is entitled to avoid the Executive Payments and the Executive Preference Payments pursuant to 11 U.S.C. §§ 544, 547, and 548.

177.    Olsen and Brissman were the initial transferees of the Executive Payments and the Executive Preference Payments.

178.    Accordingly, the Trustee is entitled to recover the transfers constituting the Executive Payments and the Executive Preference Payments to Olsen and Brissman, plus interest pursuant to Section 550 of the Bankruptcy Code.

### RELIEF REQUESTED

WHEREFORE, Harry Shaia, Jr., Trustee, by Special Litigation Counsel for the jointly administered estates of the Debtors, seeks entry of an order granting judgment in his favor and against the Defendants as follows:

(i)    holding the Defendants who were members of the Debtor Holding Company Board, the DESI Board, the Debtor Subsidiary Boards jointly and severally liable for damages for breaches of their fiduciary duties in an amount in excess of $15 million;

(ii)    holding the Defendants who were officers of the Debtors jointly and severally liable for damages for breaches of their fiduciary duties in an amount in excess of $15 million;

(iii)    holding Olsen liable for breaches of his fiduciary duties and employment contract in the amount in an amount in excess of $15 million;

(iv)    holding the Defendants liable of civil conspiracy under Virginia common law;

(v)    holding the Defendant liable for statutory conspiracy under Va. Code §§ 18.2-499

and under Va. Code 18.2-500 awarding treble damages, costs of this suit, and attorneys' fees;

(vi)    holding Olsen and Brissman liable for avoidance and recovery of the Executive

Payments and Executive Preference Payment and entering judgment against Olsen and Brissman

in the amount of their respective payments, plus interest; and

(vii)    Granting such additional relief as this Court deems just.

HARRY SHAIA, JR., CHAPTER 7 TRUSTEE

/s/ *Vernon E. Inge, Jr.*
Counsel

Vernon E. Inge, Jr. (Va. State Bar No. 32699)
Corey S. Booker (Va. State Bar No. 73419)
Robert N. Drewry (Va. State Bar No 91282)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:    804.977.3301
Facsimile:    804.977.3291
E-Mail:    vinge@wtplaw.com
E-Mail:    cbooker@wtplaw.com
E-Mail:    rdrewry@wtplaw.com

*Special Litigation Counsel for Harry Shaia, Jr., Chapter 7 Trustee*