UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 18-33822-KLP |
| DELTA CAREER EDUCATION CORP., *et al.*, | ) | Chapter 7 |
| | ) | |
| *Debtors*. | ) | (Jointly Administered) |
| | ) | |
| HARRY SHAIA, JR., TRUSTEE | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| v. | ) | Adv. Proc. No. |
| | ) | |
| ANCORA INTERMEDIATE HOLDINGS, LLC; | ) | _____ |
| STVT-AAI EDUCATION INC.; | ) | |
| MARBLEGATE SPECIAL OPPORTUNITIES | ) | |
| MASTER FUND, L.P.; | ) | |
| and | ) | |
| FIELD POINT AGENCY SERVICES, INC. | ) | |
| | ) | |
| *Defendants*. | ) | |

## **COMPLAINT**

Harry Shaia, Jr., Trustee (the "**Trustee**"), by counsel, chapter 7 trustee for Delta Career

Education Corporation (the "**Debtor**," and collectively with its 13 direct and indirect subsidiaries

Vernon E. Inge, Jr. (Va. State Bar No. 32699)
Corey S. Booker (Va. State Bar No. 73419)
Robert N. Drewry (Va. State Bar No. 91282)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:       804.977.3301
Facsimile:       804.977.3291
E-Mail:       vinge@wtplaw.com
E-Mail:       cbooker@wtplaw.com
E-Mail:       rdrewry@wtplaw.com
*Special Litigation Counsel for Harry Shaia, Jr., Chapter 7 Trustee*

who are debtors in this jointly administered case, the "**Debtors**"),[1] by and through his special litigation counsel, asserts the following claims against Ancora Intermediate Holdings, LLC ("**Ancora**"), STVT-AAI Education, Inc. ("**STVT**"), Marblegate Special Opportunities Master Fund, L.P. ("**Marblegate**"), and Field Point Agency Services, Inc. ("**Field Point**") (collectively, the "**Defendants**").

## Procedural Background

1.      This bankruptcy case was commenced by the Debtors filing voluntary petitions for relief under Chapter 7 of the Bankruptcy Code on July 26 and 27, 2018 (collectively, the "**Petition Date**").

2.      The Court entered an Order [D.N. 18] on August 1, 2018, providing for the joint administration of the Debtors' bankruptcy cases (collectively and as jointly administered, the "**Bankruptcy Case**").

## Jurisdiction and Venue

3.      The Trustee brings this action pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), sections 105, 502, 544, 547, 548 and 550 of

---

[1]      In addition to Delta Career Education Corporation, the following 13 related entities filed chapter 7 bankruptcy cases: Academy of Court Reporting, Inc. (Case No. 18-33819); Atlantic Coast Colleges, Inc. (Case No. 18-33820) Berks Technical Institute, Inc. (Case No. 18-33821); Creative Circus, Inc. (Case No. 18-33814); Delta Educational Systems, Inc. (Case No. 18-33818); McCann Education Centers, Inc. (Case No. 18-33828); McCann School of Business and Technology, Inc. (Case No. 18-33825); Miller-Motte Business College, Inc. (Case No. 18-33827); National Career Education, Inc. (Case No. 18-33829); Palmetto Technical College, Inc. (Case No. 18-33801); Piedmont Business Colleges, Inc. (Case No. 18-33830); Southwest Business Colleges, Inc. (Case No. 18-33831); The Miami-Jacobs Business College Company (Case No. 18-33826).

Title 11 of the United State Code (the "**Bankruptcy Code**"), and other applicable federal and state law.

4.      This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 157 and 1334. This Complaint includes both core and non-core claims under 28 U.S.C. § 157.

5.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The Trustee consents to this Court entering final orders in this Bankruptcy Case.

## Nature of the Action

7.      The Trustee brings this action to recover damages arising out of Defendants' conversion, aiding and abetting breaches of fiduciary duty, fraudulent conveyances, civil conspiracy, statutory conspiracy, and inequitable conduct.

8.      The Trustee brings this action to recover damages arising out of and relating to, among other things, a transaction on January 18, 2018 (the "**Ancora Transaction**"), pursuant to which Delta Career Education Corporation (the "**Debtor Holding Company**") and its subsidiary companies sold certain assets to Ancora and STVT, and the Debtors' secured lenders transferred the Debtors' debts to Marblegate, Field Point, and ultimately STVT. As a result of the Ancora Transaction, the Defendants controlled all of the Debtors' profitable assets and served as the sole senior secured lender of debt in the amount of $15,533,372.16.[2]

---

[2]      The original proof of claim, filed on December 3, 2018, asserted a secured claim of $15,533,372.16. *In re Delta Career Education Corp.*, Case No. 18-33822, Claim No. 72-1. Field Point amended its proof of claim on August 13, 2020, reducing its claim to $6,894,025.84. As explained below, the Trustee disputes the validity of the Amended Marblegate Claim.

9.      Prior to this Bankruptcy Case and the closure of their business, the Debtors were engaged in the business of for-profit, post-secondary, career-oriented education. The Debtors operated 35 ground campuses, four online programs, 16 commercial drivers' license locations, and nine international truck driving schools. The Debtors' business was organized across 10 brands throughout the country.

10.     No part of the Ancora Transaction benefited the Debtors and their substantial creditors (excluding the Defendants). Instead, the consummation and implementation of the Ancora Transaction benefited the members of the Boards of Directors of the Debtor Holding Company and its subsidiaries[3] and the Defendants.

11.     The substance of the Ancora Transaction involved two parts. First, Ancora would acquire certain of the Debtors' schools and continue to operate those schools as part of Ancora's network of schools (the "**Good Schools**").[4] Second, Ancora agreed to provide certain services to the Debtors to teach-out and wind-down the Debtors' schools it was not acquiring (the "**Bad Schools**") by the end of the Spring 2018 semester.[5]

---

[3]     The Debtor Holding Company Board shall be referred to as the "**Debtor Holding Company Board**."  Likewise, the Debtor subsidiaries and their boards shall be referred to as: (i) the Debtor Operating Company, Delta Education Systems, Inc. ("**DESI**") (the "**DESI Board**"); and (ii) the Debtor Subsidiary Companies (the "**Debtor Subsidiary Boards**"), and/or as officers of the Debtor Holding Company, DESI, or the Debtor Subsidiary Companies.

[4]     The Good Schools were the following schools and locations: (i) BTI – Wyomissing, PA; (ii) Creative Circus – Atlanta, GA; (iii) McCann School of Business & Technology – Allentown, PA, Lewisburg, PA, Monroe, LA, Shreveport, LA; (iv) Miller-Motte Technical College – Augusta, GA, Chattanooga, TN, Columbus, GA, Conway, SC, Macon, GA, Charleston, SC; (v) Miller-Motte College – Cary, NC, Fayetteville, NC, Jacksonville, NC, Raleigh, NC, Wilmington, NC, Dallas, TX, Sunland Park, NM.

[5]     The Bad Schools were the following schools and locations: (i) McCann School of Business and Technology, Inc. – Hazelton, Carlisle, Dickson City and Wilkes-Barre, PA; (ii) The

12.     Put simply, the Ancora Transaction resulted in Ancora acquiring Debtors' Good Schools and their liabilities in exchange for $5,000,000.00, which was the amount the parties knew was needed to fund the wind-down of the Bad Schools, pay professional fees, and rid themselves of any potential personal liability – all at the expense of the Debtors.

13.     Through the Ancora Transaction, Defendants took the valuable assets from the Debtors for little to no consideration. Defendants then controlled the Debtors and wound them down in a way that further damaged the Debtors' creditors.

14.     Following the closing of the Ancora Transaction, Ancora effectively controlled all aspects of the teach-out and wind-down of the Bad Schools, including all of the Debtors' financial, management, and operational functions. The remaining officers of the Debtor Holding Company and the Debtor Operating Company, DESI, were mere figureheads who – at least in some cases – received substantial compensation in return for which they provided no services of any value to the Debtors. Ancora recklessly "managed" the wind-down by, among other things, disposing of the Debtors' various remaining assets for no consideration.

15.     After the Ancora Transaction and wind-down, the Debtors were left without an operating business and no business possibilities, very few assets, over $10 million in purported secured debt, and over $54 million[6] in unsecured debt. In contrast, after the Ancora Transaction,

---

Miami-Jacobs Business College Company – Columbus, Dayton, Independence and Troy, OH; and (iii) Miller-Motte Business College, Inc. – Lynchburg and Roanoke, VA; Madison and Clarksville, TN.

[6]     This amount is based only on the Trustee's analysis of the claims register for all of the Debtors' cases. It excludes claims that were filed in multiple cases, such as the claims of Ancora and Field Point.

Ancora owned and operated the Debtor's valuable assets, the Good Schools, for which it paid little to no value.

16.     At the same time as the Ancora Transaction, the Debtors' secured lenders transferred all of their right, title, and interest in the majority of the Debtors' secured debt to Field Point as the agent for Marblegate, who was an ultimate parent of Ancora. Through this transfer, Ancora pocketed at least $11.5 million dollars, and continues to assert a security interest in the residual assets of the Debtors' bankruptcy estates.

17.     As explained more fully below, following the Ancora Transaction, the Defendants owned and controlled the Debtors' assets as well as owning and controlling at least $15 million in purported secured debt.

**The Parties**

18.     The Trustee was appointed interim trustee in the Bankruptcy Case on July 27, 2018, and continues to serve as Trustee in this Bankruptcy Case. [D.N. 6].

19.     On May 9, 2019, the Trustee engaged Whiteford, Taylor & Preston, L.L.P. as special litigation counsel for the Bankruptcy Case ("**Special Litigation Counsel**"). Among other things, the Trustee engaged Special Litigation Counsel to investigate potential claims and causes of action belonging to the Debtors' bankruptcy estates and to prosecute the meritorious claims and causes of action.  [D.N. 91].

20.     Ancora is a Texas limited liability company with its principal place of business in Dallas, Texas. Ancora purchased a portion of the Debtors' assets on or about January 18, 2018.

21.     STVT is a Texas corporation with its principal place of business in Dallas Texas. Together with Ancora, STVT operates a for-profit education company which includes several of

the Debtors' former schools. In addition, following the Loan Assignment (as defined below), Marblegate allegedly assigned a 100 percent economic participation interest in the Debtors' outstanding debt to STVT.

22.     Marblegate is an investment fund created by Marblegate Asset Management, LLC, with its principal place of business in Greenwich, Connecticut. Marblegate was part of the Original Lender Group (as defined below), and following the Ancora Transaction, Marblegate is purportedly the Debtors' sole lender.

23.     Field Point is a Delaware corporation and agent to Marblegate following the Ancora Transaction.

**Factual Background**

*The Debtors' Corporate Structure*

24.     Prior to this Bankruptcy Case and the closure of their business, the Debtors were engaged in the business of for-profit, post-secondary, career-oriented education. The Debtors operated 35 ground campuses, four online programs, 16 commercial drivers' license locations, and nine international truck driving schools. The Debtors' business was organized across 10 brands throughout the country.

25.     Joseph A. Kennedy, III ("**Kennedy**") founded DESI in the late 1990s in Virginia Beach, Virginia. The company grew to include several schools with locations in Georgia, Louisiana, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee and Virginia.

26.     In or about 2006, Gryphon Investors, Inc. ("**Gryphon**"), a private equity firm based in San Francisco, California, acquired DESI and its subsidiaries through a Delaware holding company called Gryphon Colleges Corporation ("**GCC**") (the "**Gryphon Acquisition**").

The Gryphon Acquisition merged DESI and its 16 accredited career colleges with National Career Education, Inc. ("**NCEI**"), a subsidiary of GCC, which had four campuses.

27.     At or near the time of the Gryphon Acquisition, GCC changed its name to Delta Career Education Corporation (previously defined as the "**Debtor Holding Company**").

28.     Following the Gryphon Acquisition, DESI had the following subsidiary companies: Creative Circus, Inc. ("**Creative Circus**"), Berks Technical Institute, Inc., McCann School of Business and Technology, Inc., Atlantic Coast Colleges, Inc., McCann Educations Centers, Inc., The Miami-Jacobs Business College Company, Academy of Court Reporting, Inc., Miller-Motte Business College, Inc., Palmetto Technical College, Inc., and Piedmont Business Colleges, Inc. Only one debtor – Southwest Business Colleges, Inc. – is a subsidiary of NCEI (collectively, all of the Debtors listed in this paragraph, with the exception of DESI, shall be referred to as the "**Subsidiary Debtors**").

*The Debtors' Operations*

29.     Following the Gryphon Acquisition, Gryphon controlled and operated the Debtor Holding Company, DESI, NCEI, and the Subsidiary Debtors collectively as one of its portfolio companies. Gryphon's partners served on the Debtor Holding Company Board and held a majority of the seats on the Debtor Holding Company Board at all times after the Gryphon Acquisition.

30.     In or about October 2007, the Debtors hired Alan Sussna ("**Sussna**") as President and CEO of the Debtor Holding Company. Sussna was appointed to the Debtor Holding Company Board in February 2008.

31.    During Sussna's almost five-year tenure, the Debtor Holding Company, DESI, and the Subsidiary Debtors grew substantially. As of 2017, the Debtors had 43 campuses, plus online "campuses" across its 10 brands of schools.

32.    A substantial part of the Debtors' revenue came from the federal government in the form of financial aid for their students.

33.    Title IV ("**Title IV**") of the Higher Education Act of 1965, as amended, 20 § 1070, *et seq.* (the "**HEA**") established various student loan and grant programs, including but not limited to, the Federal Pell Grant Program ("**Pell**"), the Federal Family Education Loan Program ("**FFELP**"), and the Federal Direct Loan Program ("**FDLP**") (collectively "**Title IV Program Funds**"). In order to receive Title IV Program Funds, the Debtors had to comply with specific provisions of the HEA and the related DOE regulations. *See* 34 CFR § 668.14.

34.    Among other things, the Debtors were required to maintain certain financial metrics to demonstrate that the Debtors were financially responsible. 20 U.S.C. § 1099c, 34 CFR § 668.15. As part of the financial responsibility requirements under the HEA and its corresponding regulations, the Secretary of Education has authority to require financial guarantees from institutions and individuals who exercise substantial control over such institutions and/or to require individuals who exercise substantial control over such institution to assume personal liability for financial losses to the Federal Government, student assistance recipients, and other program participants for funds under Title IV.  20 U.S.C. § 1099c.

35.    Beginning in 2007, the DOE had determined the Debtors were not financially responsible.  The DOE only allowed the Debtors to continue to receive Title IV Program Funds under a provisional certification. In connection with such provisional certification, the DOE

required the Debtor Holding Company to maintain a letter of credit representing 15 percent of the aggregate amount of Title IV Program Funds received by the Debtors during their most recently ended fiscal year, with the amount adjusted annually (the "**DOE Letter of Credit**"). The DOE also placed the Debtors on a Heightened Cash Monitoring payment method to provide additional oversight of its cash management.

*The Debtors' Debt Structure*

36.     The Debtors also maintained a complicated debt structure as part of their operations.

37.     Beginning in 2006, DESI was the borrower under a complex loan structure in which a group of lenders (the "**Original Lender Group**") agreed to loan DESI: (i) maximum term loan commitments in the amount of $55 million; (ii) maximum revolving loan commitments in the amount of $20 million; and (iii) revolving loan commitments that could be used for the issuance of letters of credit, not to exceed $12 million (collectively, the "**Loans**"). General Electric Capital Corporation was the original administrative agent for the Original Lender Group and was replaced by Antares Holdings, LP (the "**Original Agent**").

38.     The Debtor Holding Company and the Subsidiary Debtors are parties to guaranty agreements with respect to the Loans.

39.     The Debtors are also parties to a security agreement in favor of the Original Lender Group which purports to give the Original Lender group a security interest in, among other things, all of the Debtors' personal property including cash and bank accounts. The Original Lender group perfected its purported liens on some of the Debtors' numerous bank accounts by filing Deposit Account Control Agreements ("**DACAs**") or similar documents.

40.     In November 2016, DESI, the Debtor Holding Company, the Subsidiary Debtors, and the Original Lender Group, through the Original Agent, entered into a Restructuring Agreement and Amended and Restated Credit Agreement. The agreements provided that the outstanding principal on the term loan was $13,603,284.39, with $455,146.57 in accrued interest. The agreements provided a maximum revolving loan commitment in the amount of $36,422,153.75 and the existing DOE Letter of Credit from the Original Agent in favor of the DOE in the amount of $35,556,935.00.

### *Delta Begins To Have Financial Difficulties*

41.     Before the Ancora Transaction, certain of the Debtors experienced financial difficulties. For example, the Debtor Holding Company Board minutes from a December 2, 2014 meeting note the Debtors' financial documents showed "expected shortfalls in revenue (approximately $18 million) and in [EBITDA] (approximately $10 million) compared to the [Debtors'] original fiscal year 2015 budget" and describe "breaches of certain financial covenants in [the Debtors'] senior debt agreements that [the Debtors] expected to occur as of December 31, 2014 and the corresponding suspension of cash interest payments on [the Debtors'] subordinated debt and payment of management fees that would result."

42.     From at least that point on, December 2, 2014, the Debtors were in the zone of insolvency.

43.     Beginning in at least 2016, the Debtor Holding Company, led by Gryphon, was trying to refinance its business or sell it.

44.     In addition to its financial difficulties, in September 2016, the accreditor for most of the Debtors' schools, Accrediting Council for Independent Colleges and Schools ("**ACICS**"),

received a notice of default from the DOE.  ACICS's appeal was denied in December 2016. As a

result, all of the Debtors' schools accredited under ACICS had 18 months (through May 2018) to

find a new accreditor in order to continue participating in federal student aid programs.

45.    In July 2017, the Debtors learned another accrediting agency, Accrediting Council

for Continuing Education and Training ("**ACCET**"), denied its request to be accredited through

that agency. At this point, the Debtors' only option was to merge with another accredited school

or to close.[7]

46.    Closing on a transaction with another accredited school presented its own set of

challenges. DOE regulations require institutions to submit a teach-out plan to its accrediting

agency before closing. 34 CFR § 6002. A teach-out is a process in which a school engages in an

orderly closure. The school no longer accepts new students and is required to make sure that any

student that did not graduate before closure had another school to complete his or her education.

Teach-outs are expensive because as the number of students decreases, so does the level of Title

IV Program Funds and other tuition paid to a school, while fixed and operating costs still have to

be paid.

47.    Moreover, if the Debtors simply walked away from their schools without an

orderly wind-down, the Debtors would be liable to the federal government for all tuition received

for students who did not graduate. The DOE also would draw on the DOE Letter of Credit to

fund the debt, liabilities or reimbursable costs, including those associated with the teach-out.

Finally, if the Debtors did not have enough cash collateral to cover their DOE Letter of Credit,

---

[7]    The Debtors could not file a chapter 11 reorganization and continue to receive Title IV
Program Funds. An institution who files for relief in bankruptcy is ineligible to receive Title IV
Program Funds. 34 CFR § 600.7.

the DOE could require Gryphon and/or members of the Debtor Holding Company Board, the

DESI Board, and Subsidiary Debtors to assume personal liability for the financial losses related

to the closure.

*The Ancora Transaction*

48.    In May 2017, the Debtors had an immediate need for $3 million in liquidity, and

STVT-AAI Education, Inc. (previously defined as "**STVT**"), an Ancora affiliate, agreed to make

a short-term loan that was secured by a purported lien that took priority over the secured debt.

The short-term loan was repaid in July 2017. The parties agreed to the short-term loan, in part,

because Ancora had provided a letter of intent to purchase a substantial portion of the Debtor

Holding Company and its subsidiaries' assets.

49.    Accordingly, at or around the same time as the short term loan, the Debtor

Holding Company Board began discussions with Ancora and STVT for a sale of the Debtors'

business.

50.    Throughout the summer and fall of 2017, the Debtor Holding Company Board

and the Debtors' equity sponsor, Gryphon, negotiated the terms of the transaction with the

Defendants and the Original Lender Group and their respective counsel. Ancora and STVT

conducted due diligence that included a review of documents and campus visits.

51.    The Debtors were essentially unrepresented in the transaction even though

Gryphon's counsel, Kirkland & Ellis, ostensibly represented the Debtors, Gryphon, and the

individual Debtor Holding Company Board Members. It was clear, however, that Gryphon and

the individual Debtor Holding Company Board Members were more interested in avoiding

personal liability than protecting the Debtors. The Debtors' interests separate and apart from its directors were not addressed or negotiated as part of the Ancora Transaction.

52.     As a result, the plan was developed that the Debtors would sell some of their assets and liabilities to Ancora, but other liabilities and assets would remain with the Debtors. Ancora would assist with a teach-out of certain of the Debtors' schools. Following the completion of the teach-out, the Debtors would file chapter 7 bankruptcy in a "favorable jurisdiction."

53.     The original asset purchase agreement was executed in October 2017 and contained a "no-shop" provision that prohibited the Debtors from marketing or trying to sell the Bad Schools that Ancora did not identify as schools it wanted to purchase.

54.     The effect of this "no-shop" provision was that the Debtors had to wind down and teach-out the Bad Schools, without the necessary assets to do so. In essence, the "no-shop" provision forced the Debtors to accept Ancora and STVT as their wind-down partners, with Ancora and STVT controlling all aspects of the wind-down with no regard for the Debtors and their creditors.

55.     The transaction did not close in October 2017 because the DOE rejected the proposed acquisition. Specifically, the DOE rejected the number of schools Ancora proposed to acquire.

56.     Accordingly, the parties modified the acquisition and, in January 2018, executed the Amended & Restated Asset Purchase Agreement (the "**Asset Purchase Agreement**") along with several related transaction documents, including, but not limited to, the Transition Services Agreement, the Wind-Down Agreement, and the Surety Escrow Agreement.

57.     The basic mechanics of the acquisition remained the same; however, in the final Asset Purchase Agreement, Ancora purchased fewer schools – *i.e.*, the Good Schools.

58.     The Asset Purchase Agreement is complex and detailed, relying on both internal cross-references and definitions, and cross-references to documents such as the November 22, 2016 Amended and Restated Credit Agreement.

59.     Yet, despite its complexity and details, the Asset Purchase Agreement intentionally omits many key details, such as an accurate list of purchased assets and liabilities assumed by Ancora, or any closing documents showing the sources and uses of cash, such as the Cash Collateral, or an accurate list of post-closing expenses to be paid.

60.     The Asset Purchase Agreement also required Ancora to provide services to the Debtors to teach-out and wind-down the Bad Schools through the end of the spring 2018 semester because the no-shop provision in October 2017 prohibited the Debtors from finding another way to liquidate those assets and liabilities.

61.     As the total consideration for the Ancora Transaction, Ancora agreed to: (i) perform all of the required obligations related to the wind-down and teach-out as set forth in the Transition Services Agreement and Wind-Down Agreement; and (ii) assume certain liabilities of the Debtors.[8] Ancora did not agree to pay the Debtors any cash or other funds other than the funds for the wind-down.

---

[8]     The liabilities that Ancora agreed to assume are only generally identified in the Asset Purchase Agreement. For example, Ancora purportedly assumed certain accounts payable which are not defined or specifically identified.

62.     At closing, the Asset Purchase Agreement required the Debtors to transfer and assign all of the Purchased Assets, as defined by the Agreement and including but not limited to the Good Schools, to STVT "as a deemed contribution" on behalf of Ancora.

63.     At the closing of the Ancora Transaction, Ancora paid a total of $5,000,008.00 to fund the wind-down and teach-out. Of that amount, $4,350,538.00 was deposited into an escrow account that funded the wind-down and teach-out of the Bad Schools. The remaining $649,470.00 was used to pay closing expenses related to the Ancora Transaction, mostly to the Debtors' professionals who simply allowed Ancora and/or the Gryphon-led Holding Company Board of Directors to do what it wanted.

64.     The Asset Purchase Agreement also provided for a net working capital adjustment (the "**NWC Provision**"). This provision allowed for an adjustment based on the Debtors' estimated closing net working capital figure *versus* Ancora's actual closing net working capital figure. The net working capital was calculated by subtracting the value of the acquired liabilities from the purported value of the assets that Ancora purchased at closing.

65.     A net working capital adjustment is typically used in transactions to make sure a buyer actually receives the capital it paid for as part of the transaction. In essence, it allows for a purchase price adjustment, up or down, if necessary, based on a comparison between the selling entity's estimated net working capital and an agreed-upon target net working capital.  Further, in definitive acquisition agreements, parties routinely agree on a target amount for the seller's target net working capital (based on the seller's financial condition and results). Prior to closing, the seller provides an estimate of its closing net working capital, and the purchase price to be paid by the buyer is adjusted, up or down, depending on whether the estimate is higher or lower than the

agreed-upon target.  There is subsequently a "true-up" of the net working capital, which involves

an actual computation of closing net working capital made shortly after closing which leads to a

corresponding additional adjustment in the purchase price. If the final or actual net working

capital is below the estimated closing net working capital, the seller pays back a portion of the

purchase price. If the final or actual net working capital is above the estimated net working

capital, then the buyer pays additional consideration to the seller. In connection with the

foregoing estimates and adjustments, the definitive asset purchase agreement typically includes

very clear provisions for how and when any payments based on the final net working capital

calculations are to be made.

66.      In the context of the Ancora Transaction, it is not entirely clear that the NWC

Provision makes sense or is appropriate. The transaction was largely a distressed sale of the

Debtors' assets, and Ancora did not pay an actual purchase price for the Debtors' assets. As

such, there was no corresponding payment to be adjusted based on the estimated or final net

working capital. Furthermore, although the Asset Purchase Agreement includes a net working

capital target of $0 (with no explanation of how that target was determined), it does not appear

that the target was used as part of the net working capital adjustment process.  That is, the NWC

Provision does not provide for a comparison of the Debtors' estimated closing net working

capital against the target, $0. Rather, the NWC Provision requires simply a comparison between

the Debtors' estimated closing net working capital and the final net working capital, once

determined in accordance with the described process following closing. The difference resulting

from that comparison is referred to in the Asset Purchase Agreement as the Net Working Capital

Adjustment, although the Asset Purchase Agreement does not specifically provide that Ancora is

entitled to receive a payment from the Debtors based on any adjustment amount (except as provided with respect to the Surety Bond Escrow Account (as defined below). As noted above, the calculation of the final net working capital amount following closing: (i) was intended to calculate the Debtors' net working capital as of closing, and (ii) was to be completed within 60 days following closing (subject to the designated dispute resolution provisions), with the Debtors being involved in that process.

67.     Upon information and belief, Ancora did not follow the required procedures to obtain the Net Working Capital Adjustment. Likewise, it appears that Ancora has extended the process for calculating the final net working capital continued well past closing.

68.     The Asset Purchase Agreement also created an escrow fund that had the purpose of paying any required adjustment based on the NWC Provision (the "**Surety Bond Escrow Account**"). The Surety Bond Escrow Account was funded with money that the Debtors had provided as cash collateral to certain surety companies. As those surety companies cancelled bonds and returned cash collateral to the Debtors, the cash collateral for those bonds was deposited into the Surety Bond Escrow Account.

69.     The Asset Purchase Agreement did not require Ancora to put any money into the Surety Bond Escrow Account.

70.     The effect of the Asset Purchase Agreement's vague language regarding the specific liabilities that Ancora assumed and the confusing nature of the NWC Provision was a built-in safeguard or additional money maker for Ancora. Regardless of the value of the Debtors' assets it acquired, Ancora could identify liabilities it allegedly assumed and include those in its net working capital calculation it would charge to the Debtors. Ancora has done exactly this –

18

claiming the Debtors owe Ancora an additional $11,214,000.00 as a result of the NWC Provision.  (Case No. 18-33822, Claim No. 69-1).

*The Loan Assignment*

71.    In connection with the Ancora Transaction and pursuant to the Commitment and Agency Assignment and Acceptance, on January 8, 2018, the Original Lender Group assigned the purported outstanding debt to Marblegate Special Opportunities Master Fund, L.P. (previously defined as "**Marblegate**") and ***PAID*** Marblegate $2 million as part of the assignment (the "**Loan Assignment**").

72.    As a result, the Original Lender Group transferred the purported outstanding loan obligations and the cash collateral securing the letters of credit to Marblegate. The Original Lender Group also assigned all of their right, title, and interest in their purported security interests in the Debtors' property to Marblegate. The Commitment and Agency Assignment and Acceptance also appointed Field Point as the agent for Marblegate.

73.    At the time of the Loan Assignment, $15,505,978.94 in principal and $31,436.78 in accrued interest were purportedly outstanding on the Term Loan. The Revolving Loan Commitment at the time of assignment was $35,556,935.00, with $0.00 outstanding. The Original Lender Group also transferred $11,561,198.90 in cash to Marblegate that the Original Lender Group had held as purported security for DOE Letter of Credit (the "**Cash Collateral**").

74.    On the same date that the Loan Assignment closed, Marblegate allegedly paid STVT $2,000,000.00 and granted STVT an undivided 100 percent economic participation interest in all of Marblegate's right, title, and interest in and to the purported Loans and rights

transferred through the Loan Assignment (the "**Participation Agreement**"). As a result, Field Point and Marblegate transferred approximately $13,000,000.00 to STVT on the closing date.

75.     Simultaneously with the closing of the Ancora Transaction, on January 18, 2018, the DOE cancelled the DOE Letter of Credit. Therefore, the Cash Collateral was no longer necessary to secure the Debtors' obligations on DOE Letter of Credit.

76.     Marblegate did not apply the $2 million it received from the Original Lender Group as part of the Loan Assignment to any of the Debtors' existing purported debt obligations.

77.     Likewise, and upon information and belief, once the DOE Letter of Credit was cancelled, Marblegate did not apply the Cash Collateral to any of the Debtors' existing purported debt obligations.

78.     Instead, Marblegate converted the Cash Collateral and used it for its own purposes, including, but not limited to, transferring it to STVT or using it as purported security for Ancora or STVT's obligations as a result of acquiring the Good Schools.

*The Effect of the Ancora Transaction and Loan Assignment on the Debtors*

79.     As a result of the Ancora Transaction and Loan Assignment, at the Petition Date, the Debtors purportedly owed Marblegate $15,533,372.16 pursuant to the loan documents (the "**Marblegate Claim**") and Ancora $11,214,000.00 pursuant to the NWC Provision (the "**Ancora Claim**"). (Case No. 18-33822, Claims Nos. 72-1 and 69-1).[9]

80.     The Ancora Transaction and Loan Assignment were both backwards. In the Ancora Transaction, even though Ancora was the buyer, the Debtors ***paid*** Marblegate and

---

[9]     Marblegate and Ancora filed the same proof of claim in all 14 of the Debtors' cases. This reference is only to the claims filed in the Debtor Holding Company's case; however, the claims below seek to disallow Marblegate's and Ancora's proofs of claim in all of the Debtors' cases.

Ancora $6,561,190.00[10] in cash, plus transferred all of their accounts receivable to Ancora and incurred an additional $11,214,000.00 in purported debt to Ancora. Likewise, in the Loan Assignment, Marblegate was the buyer, but the Original Lender Group *paid* Marblegate $2 million to assign the Loans to Marblegate.

81.     Neither transaction resulted in any value to the Debtors.

82.     At a minimum, the amount of consideration Ancora paid for the Ancora Transaction was grossly inadequate. Further, Field Point, Marblegate, Ancora, and STVT took the Cash Collateral – approximately $11.5 million of cash that belonged to the Debtors – for no consideration at all and converted that $11.5 million for their own use.

83.     The true purchase price of the Ancora Transaction is shocking, given the fact that in the spring of 2017, only one of the Debtors' schools, Creative Circus, was believed to be worth $9 million to $12 million on its own.

84.     Likewise, in an e-mail later that year, on September 27, 2017, John P. Olsen ("**Olsen**"), the Debtors' CEO, told representatives of the Original Agent, Ancora's financial officers, and Andrew J. Meyers ("**Meyers**") that the combined EBITDA of the schools and the campuses that Ancora proposed to acquire was $35 million. Olsen stated in "normal times, you could easily attach a 6-7X multiple to that EBITDA to get to a valuation north of $200M. Creative Circus, which, on its own could fetch $9-$12M."[11]

---

[10]     This amount is calculated by subtracting the $5,000,008.00 Ancora paid for the wind-down expenses from the $11,561,198.00 in Cash Collateral transferred to Marblegate.

[11]     The Trustee recognized that the number of schools Ancora ultimately acquired decreased from the proposal when this e-mail was written, but even taking that decrease into account, the fact that Delta *paid* Ancora $6.5 million to purchase the assets is nowhere near the proposed EBITDA, much less a multiple of EBITDA.

*The Wind-Down Period*

85.     The Ancora Transaction closed on January 18, 2018 (the "**Closing Date**").

86.     Following the Closing Date, Ancora took over all operations of the Good Schools. During its operations of the Good Schools, Ancora utilized some of the Debtors' technology and licenses that it did not pay for in the Asset Purchase Agreement.

87.     For example, in July 2017, the Debtors paid a deposit for its annual renewal for software integration services from Boomi, a division of Dell (the "**Boomi Software**"). The Debtors used the services until the Closing Date, and Ancora used the services following the Closing Date. In August 2018, Ancora renewed the account for an additional year and simply substituted its name as the party renewing the services. Ancora never paid the Debtors for the use of the Boomi Software from January 2018 to August 2018.  The Asset Purchase Agreement does not provide any allocation for the six months Ancora used the Boomi Software.

88.     Following the Closing Date, all the Debtors' books and records for both the Good Schools and those necessary to teach-out the Bad Schools were transferred to Ancora.

89.     Ancora also directed the Debtors to destroy all books, records, and documents from its operations prior to the Closing Date.

90.     Additionally, following the Closing Date, Ancora's affiliate, Marblegate, was the Debtors' senior secured lender and purportedly maintained a security interest in all of the Debtors' remaining cash and assets.

91.     Consequently, the Defendants collectively exerted substantial control over the Debtors' remaining assets, even to the point of "giving away" the Debtors' assets (such as

furniture and fixtures) in which Ancora did not think its affiliate Defendants would wish to enforce their purported security interest, all to the detriment of the Debtors' estates.

92.    From the closing date until June 2018, the Debtors were primarily responsible for teaching-out the Bad Schools. Ancora provided support to the Debtors through its financial aid, student services and accounting department pursuant to the Transition Services Agreement and Wind-Down Agreement.

93.    Ancora hired a small group of the Debtors' employees to work for it. These employees were in the financial affairs and marketing departments. As a result, the Debtors' bank accounts were controlled by both Ancora and the Debtors' employees after the Closing Date.

94.    After the Closing Date, the Debtors employed only a skeleton crew of employees for their operations. With limited exceptions, mainly at the individual school level, these employees – namely Olsen and Charles P. Brissman ("**Brissman**") – provided no value to the Debtors despite receiving substantial compensation from the Debtors.

95.    After the Closing Date, Martina Hansen ("**Hansen**") assumed the role of the Debtor Holding Company's Chief Executive Officer. The Debtor Holding Company Board, however, did not officially appoint Hansen to the job until May 30, 2018, and only after Hansen requested the appointment in order close the Debtors' bank accounts.

96.    Hansen was the primary contact for the administrator of each Bad School and worked with each Bad School to make sure the teach-out was completed as required by law.

97.     Meyers, on behalf of the Debtor Holding Company Board, as well as Ancora's CEO, Michael Zawisky, directed Hansen's actions during the wind-down, including obtaining approval from them for payment of certain expenses.

98.     Neither Olsen nor Brissman provided any direction or guidance to Hansen, the Debtors, or the Debtor Holding Company Board during the wind-down period.

99.     The Bad Schools were "taught out" over the spring 2018 semester.

*Post-Petition Conduct*

100.     The Debtors filed their Petitions on the Petition Date.

101.     The Debtors' schedules identify secured debts to Field Point as the agent for Marblegate in the amount of $15,459,239.54 (Case No. 18-33822, D.N. 1) and from the outset of the Bankruptcy Case, Field Point has asserted a lien on all of the Debtors' assets.

102.     At the beginning of the Bankruptcy Case, the Defendants, through counsel, proposed a cash collateral order to the Trustee that would have allowed the Trustee to utilize no more than $15,000.00 of the Debtors' cash to conduct a limited investigation of the Defendants' involvement in the Ancora Transaction and the validity of the Defendants' purported claims against the Debtors and purported security interests in and liens against the Debtors' assets.

103.     The Trustee rejected the proposed cash collateral order because it would not permit him to perform his duties to the Debtors' bankruptcy estates, including the duty to thoroughly investigate the Defendants' involvement in the Ancora Transaction and the validity of the Defendants' purported claims and liens.

104.     Both before and after his rejection of the proposed cash collateral order, the Trustee requested that the Defendants provide documents and other information, specifically

including information concerning the Defendants' calculation of the purported secured claim and Ancora's unsecured claim. Initially the requests were made by the Trustee's general counsel, and, thereafter, the Trustee's special litigation counsel renewed such requests.

105.    The Defendants, through counsel, claimed that they did not have any records of the history of the Debtors' loan amounts or payments prior to the Closing Date.

106.    For nearly 22 months, the Defendants stonewalled the Trustee and consistently insisted that their claims were as set forth in the proofs of claim they filed under penalty of perjury in the Bankruptcy Case and, in the case of Marblegate and Field Point, the claim amount set forth in the proposed cash collateral order.

107.    On July 24, 2020, the Trustee filed a separate Complaint against the directors and officers of the Debtor Holding Company and Debtor Subsidiary Companies (the "**D&O Complaint**"). (Case No. 20-03115, D.N. 1).  Among other things, the D&O Complaint alleges that the Directors and Officers of the Debtor Holding Company and Debtor Subsidiary Companies conspired with the Defendants here to convert the Debtors' Cash Collateral for the benefit of the Defendants.

108.    Similarly, on July 29, 2020, as part of settlement discussions between the Defendants and the Trustee, the Trustee shared a draft complaint of the Trustee's claims against the Defendants which also included a conversion claim and conspiracy claims related to the Defendants' stealing the Debtors' cash collateral.

109.    After ignoring the Trustee's numerous and frequent requests for nearly 22 months, on August 13, 2020, after reviewing the D&O Complaint and the draft complaint against it, Field Point amended the Marblegate Claim to provide a post hoc accounting of the $11.5

million it converted (the "**Amended Marblegate Claim**").  (*See* Case No. 18-33822, Claim No. 72-2).  The Amended Marblegate Claim asserts a claim in the amount of $6,894,025.84, of which $6,728,067.54 is secured and $165,958.30 is unsecured.

110.    For the first time, the Amended Marblegate Claim applied or purported to apply the Cash Collateral to the secured debt. Additionally, for the first time, the Amended Marblegate Claim asserted that there is $3,432,980.59 in letter of credit fees due and owing to the original lenders, and consequently, Marblegate despite the fact that the DOE Letter of Credit was cancelled in January 2018.

111.    The Amended Marblegate Claim is an admission that the Defendants converted the $11.5 million Cash Collateral and had no intention of crediting it to the Debtors unless and until the Trustee discovered it. Further, through the offer on the Cash Collateral order and other efforts, Defendants attempted to conceal the fact that they had converted the $11.5 million Cash Collateral to their own use.

112.    In further efforts to conceal the Defendants' conversion, just days before the deadline for the Trustee to file his claims, the Defendants filed a supplement to the Amended Marblegate Claim supposedly providing evidence it credited the $11.5 million Cash Collateral to the Debtors' loan balances at the time they received it (the "**Supplement**") (Case No. 18-33818, D.N. 8).  The Supplement, however, fails to demonstrate application of the $11.5 million Cash Collateral on the Closing Date to the Debtors' loan.

113.    Similarly, on October 28, 2020, Ancora amended the Ancora Claim. Based on the amended Ancora Claim, the Debtors purportedly now only owe Ancora $6,576,000.00 pursuant to the NWC Provision. (Case No. 18-33822, Claim No. 69-2).

114.    The Defendants sought to frustrate and restrict the Trustee's ability to investigate the Ancora Transaction and the various insider transactions that were a part thereof, or related thereto, and which caused the Debtors and their creditors substantial damages. As soon as they were finally caught, the Defendants concocted a new story and, in so doing, seek to change the information they previously provided knowing it not to be true or recklessly disregarding the truth.

## COUNT I
## Conversion

115.    The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

116.    Field Point as the Agent for Marblegate accepted the $11.5 million Cash Collateral as part of the Commitment and Agency Assignment and Acceptance.

117.    Upon information and belief, Field Point, at the direction of Marblegate, disbursed the $11.5 million Cash Collateral to STVT.

118.    Marblegate and/or STVT used the $11.5 million Cash Collateral to fund their own obligations or the obligations of its subsidiaries or affiliates, including Ancora or STVT.

119.    Neither Marblegate nor STVT credited the Debtors' loan obligations with the $11.5 million Cash Collateral at the time of receipt.

120.    Once the Defendants used the Cash Collateral for their own use on January 18, 2018, it was no longer subject to Marblegate's purported security interest and could not be credited to the Debtors at a later date. Put another way, once the Cash Collateral was converted and no longer the Debtors' property, Defendants forfeited any alleged security interest in the $11.5 million Cash Collateral.

121.    Similarly, once Field Point and/or Marblegate transferred the $11.5 million Cash Collateral to STVT, Marblegate's security interest in the $11.5 million Cash Collateral was terminated.

122.    As a direct and proximate result of Field Point's, Marblegate's, Ancora's, and STVT's conversion and use of the $11.5 million Cash Collateral, the Debtors have been damaged in the amount of $11.5 million.

**COUNT II**
**Turnover of Property**

123.    The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

124.    As an alternative to Count I, the Trustee asserts this cause of action.

125.    Once the Defendants used the Cash Collateral for their own use, it was no longer subject to Marblegate's purported security interest and could not be credited to the Debtors' loan two years later.

126.    Therefore, the $11.5 million Cash Collateral constitutes property of the Debtors' bankruptcy estates (collectively, the "**Estate**") pursuant to 11 U.S.C. § 541, which property is still in the possession of Field Point and/or Marblegate.

127.    Field Point and/or Marblegate have not applied the $11.5 million Cash Collateral to the Debtors' loan obligations.

128.    The $11.5 million Cash Collateral is subject to turnover pursuant to 11 U.S.C. § 542 and Bankruptcy Rule 7001.

## <u>COUNT III</u>
### Avoidance of Transfers – 11 U.S.C. § 548

129.    The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

130.    The Ancora Transaction was a transfer within the definition of 11 U.S.C. § 101 (54)(D)(i) or (ii).

131.    Ancora paid only $5 million to fund the wind-down and teach-out and other closing costs and assumed some of the Debtors' liabilities, despite the fact that the Debtor Holding Company's records show that just one of the schools Ancora purchased, Creative Circus, was worth $9 million to $12 million on its own.

132.    The benefit to Ancora from the Good Schools and accounts receivable it received as part of the Ancora Transaction was substantially more than $5 million dollars plus the liabilities it assumed.

133.    Likewise, Ancora used and benefited from many of the Debtors' prepaid contracts and services, like the Boomi Contract. Ancora did not pay any consideration for such services, nor are they accurately defined or accredited for in the Asset Purchase Agreement.

134.    The Ancora Transaction closed while the Debtors were insolvent, or the Debtors became insolvent as a result of the Ancora Transaction.

135.    At the time of the Closing Date, the property remaining with the Debtors was an unreasonably small amount of capital.

136.    At the time of the Closing Date, the Debtors, either voluntarily or involuntarily, intended to incur, or believed that they would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

137.     At the time of the Closing Date, the Ancora Transaction was made to the benefit of insiders, including, but not limited to, the Defendants, which controlled all of the Debtors' assets as both the operator of the Good Schools and secured lender of the remaining assets, and not in the ordinary course of business.

138.     As consideration for the Ancora Transaction, the Debtors received less than a reasonably equivalent value for the assets they sold, including, but not limited to, the Good Schools because the Debtors effectively ***paid*** Ancora to buy the Debtors' assets.

139.     Accordingly, the Ancora Transaction constitutes an avoidable fraudulent transfer and/or a series of avoidable fraudulent transfers pursuant to Section 548(a)(1)(B) of the Bankruptcy Code.

### COUNT IV
**Avoidance and Recovery of Fraudulent Conveyances under Va. Code §§ 55.1-400**

140.     The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

141.     The Ancora Transaction constitutes a transfer of the Debtors' personal property.

142.     Likewise, the assignment of the Cash Collateral constitutes an assignment of the Debtors' property.

143.     As explained above, Ancora paid grossly inadequate consideration to the Debtors for the Ancora Transaction.

144.     Likewise, Field Point and Marblegate did not pay the Debtors for the Cash Collateral, nor did Ancora pay for the use of software such as the Boomi Software.

145.    The Debtors entered into the Ancora Transaction and consented to the Commitment and Agency Assignment and Acceptance with the actual intent to hinder, delay, or defraud the Debtors' creditors.

146.    Ancora, STVT, Field Point, and Marblegate had knowledge or should have had knowledge of the Debtors' intent to hinder, delay, and defraud its creditors.

147.    The Ancora Transaction and the assignment of the Cash Collateral had the intended consequence of removing the Debtors' assets that would be available to repay the Debtors' creditors.

148.    Accordingly, pursuant to Va. Code § 55.1-400, the Ancora Transaction and the transfer of the Cash Collateral are void.

149.    The Defendants are liable to the Trustee for damages to be proven at trial for the Ancora Transaction, the assignment of the Cash Collateral to Marblegate, and the use of any of the Debtors' property for which they did not pay.

## <u>Count V</u>
### Avoidance and Recovery of Voluntary Conveyances

150.    The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

151.    At the time of the Ancora Transaction and the assignment of the Cash Collateral, the Debtors were insolvent and/or the Ancora Transaction and the assignment of the Cash Collateral rendered the Debtors insolvent.

152.    The Transfers were made for no consideration deemed valuable at law or grossly inadequate consideration.

153.    Accordingly, pursuant to Va. Code § 55.1-401, the transfers made as part of the Ancora Transaction and assignment of the Cash Collateral are void.

154.    The Defendants are liable to the Trustee for damages to be proven at trial for the Ancora Transaction, the assignment of the Cash Collateral to Marblegate, and the use of any of the Debtors property for which they did not pay.

**COUNT VI**
**Recovery of Transfers Under 11 U.S.C. § 550**

155.    The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

156.    The Trustee is entitled to avoid the Ancora Transaction pursuant to 11 U.S.C. §§ 544, and 548.

157.    Ancora and/or STVT were the initial transferees of the Debtors' assets through the Ancora Transaction.

158.    Field Point and Marblegate were the initial transferees of the Debtors' assets through the assignment of the Cash Collateral.

159.    Accordingly, the Trustee is entitled to recover the value of the unpaid assets transferred pursuant to the Ancora Transaction and assignment of the Cash Collateral, plus interest pursuant to Section 550 of the Bankruptcy Code.

**Count VII**
**Aiding and Abetting Breach of Fiduciary Duty**

160.    The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

161.    Field Point, Marblegate, Ancora, and STVT had actual knowledge of the fiduciary duties of care and loyalty owed by the directors and officers of the Debtor Holding Company and Debtor Subsidiary Companies described in the D&O Complaint.

162.    The Defendants gave substantial assistance, aided and abetted, and/or facilitated the directors and officers of the Debtor Holding Company and Debtor Subsidiary Companies' breach of fiduciary duty through the consummation of the Ancora Transaction and assignment of the Cash Collateral.

163.    The Defendants knew or should have known the nature of the injury to the Debtors' and their creditors brought about by such substantial assistance in the Ancora Transaction.

164.    The Defendants directly and indirectly benefited from such breaches of fiduciary duty by receiving the Good Schools, the $11.5 million Cash Collateral and other financial consideration they otherwise would not have received.

165.    As a direct and proximate result of the breach of fiduciary by the directors and officers of the Debtor Holding Company and Debtor Subsidiary Companies, the Debtors and their creditors sustained substantial damages.

166.    As a result of the Defendants' aiding and abetting the breach of fiduciary by the directors and officers of the Debtor Holding Company and Debtor Subsidiary Companies, the Trustee is entitled to recover the damages suffered by the Debtors in an amount to be proven at trial.

### Count VIII
### Civil Conspiracy

167.    The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

168.    Ancora, STVT, Marblegate, Field Point, R. David Andrews ("**Andrews**"), Nicholas A. Orum ("**Orum**"), Williard E. Lynn ("**Lynn**"), Kennedy, Olsen, Meyers, Timothy J. Ryder ("**Ryder**"), Bill Nance ("**Nance**"), Kevin A. Smith ("**Smith**"), and Brissman, together, acted in concert and combination with one another to effectuate the Ancora Transaction, the assignment of the Cash Collateral, and the subsequent wind-down of the Debtors.

169.    The purpose of the combination among Ancora, STVT, Marblegate, Field Point, Andrews, Orum, Lynn, Kennedy, Olsen, Meyers, Ryder, Nance, Smith, and Brissman, was to allow Ancora, STVT, Marblegate, and Field Point to convert the Cash Collateral ($11,500,000.00), and gain control of the Debtors' remaining assets.

170.    The Debtors have been damaged as a direct and proximate result of the actions of the Defendants, including without limitation, the loss of valuable assets to pay their creditors, which has resulted in damages to be proven at trial.

### Count IX
### Statutory Conspiracy under Va. Code §§ 18.2-499, -500

171.    The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

172.    Ancora, STVT, Marblegate, Field Point, Andrews, Orum, Lynn, Kennedy, Olsen, Meyers, Ryder, Nance, Smith, and Brissman, by acting in concert, participation, and combination with one another to transfer assets away from the Debtors and reach of the Debtors'

creditors to themselves, effectuated the Ancora Transaction and the assignment of the Cash Collateral, defrauded the Debtors' creditors, and profited from this course of conduct. Thus, the Defendants have combined, associated, and conspired with the each other and Andrews, Orum, Lynn, Kennedy, Olsen, Meyers, Ryder, Nance, Smith, and Brissman to injure the Debtors in their reputation trade, business and profession, all in violation of Va. Code Ann. §§ 18.2-499 and 18.2-500.

173.    The unlawful acts of the conspiracy were to defraud the Debtors, the Debtors' creditors, obtain certain releases from liability and insurance protections for the Defendants' personal gain, to hinder, delay, or defraud the Debtors' creditors, and/or to allow Ancora, STVT or Marblegate to unlawfully possess or control funds, and convert property in which they were not authorized to possess or control, such as the Cash Collateral, with the purpose of willfully injuring the Debtors' business.

174.    The actions of the Defendants in furtherance of the conspiracy were undertaken willfully and with full knowledge of, but conscious disregard for, the rights and claims of the Debtors' creditors.

175.    The Debtors have been damaged by the actions of the Defendants, including without limitation, the loss of valuable assets to pay their creditors, which has resulted in damages to be proven at trial.

176.    As a matter of law, pursuant to Va. Code. § 18.2-500, the Trustee is entitled to recover three times his actual damages incurred, plus his attorneys' fees reasonably incurred in prosecuting this action.

## COUNT X
### Disallowance of Claims

177.   The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

178.   Section 502 of the Bankruptcy Code provides that the claim of any transferee receiving a transfer that is avoidable under § 547 or § 548 of the Bankruptcy Code shall be disallowed unless the transferee turns over the property or the value thereof to the Estate.

179.   Ancora has filed a proof of claim in each of the Debtors' cases alleging that the Debtors owe Ancora $6,576,000.00 (previously defined as the "**Amended Ancora Claim**").

180.   Field Point, as the agent for Marblegate, has filed a proof of claim in each of the Debtors' cases alleging that the Debtors owe Marblegate/Field Point $6,894,025.84 (previously defined as the "**Amended Marblegate Claim**").

181.   Defendants have not paid or surrendered the value of the Ancora Transaction or Cash Collateral to the Trustee.

182.   To the extent that Defendants hold a claim against the Debtors or the Estate, the Court should disallow such claims pursuant to § 502 of the Bankruptcy Code because Defendants have failed to pay the Estate (or otherwise return to the Debtor or the Estate) value of the amount of the Ancora Transaction or Cash Collateral, which they converted.

## COUNT XI
### Equitable Subordination Under 11 U.S.C § 510(c)

183.   The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

184.     The Defendants' wrongdoing and conduct, as described above, was inequitable for numerous reasons, including, but not limited to, the fact that the conduct fostered the Defendants' conversion of the $11.5 million dollars and allowed the Defendants to treat the Debtors as a mere instrumentality of the Defendants by controlling the Debtors' assets through the wind-down and its purported lien in all of the Debtors' assets.

185.     The wrongdoing and inequitable conduct of each Defendant as described above injured unsecured and other creditors and necessitates that the Marblegate Claim and the Ancora Claim be subordinated to the claims of all other creditors of the Debtors pursuant to Bankruptcy Code section 510(c) and the equitable powers of the Court.

186.     As a result of the Defendants' conversion, receipt of fraudulent transfers, inequitable conduct, conspiracy, and other wrongdoing, pursuant to Bankruptcy Code 510(c), the Court should equitably subordinate the Marblegate Claim and the Ancora Claim in their entirety until all other claims against the Debtors have been satisfied in full.

## COUNT XII
### Objection to Amended Marblegate Claim
*(Field Point Only)*

187.     The Trustee incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

188.     As an alternative to the above counts, the Trustee asserts this cause of action.

189.     The Trustee is entitled to object to claims filed pursuant to Fed. R. Bankruptcy Procedure 3007.

190.    Field Point, as the agent for Marblegate, filed the Amended Marblegate Claim as a secured claim in the amount of $15,533,372.16.  (Case No. 18-33822, Claim No. 72-2).[12]

191.    The Amended Marblegate Claim represents the unpaid loan balance from the Debtors' loans that were transferred pursuant to Commitment and Agency Assignment and Acceptance.

192.    The Trustee objects to the claim for several reasons.

193.    First, based on the documents attached to the Amended Marblegate Claim and the Supplement, it appears that Marblegate and STVT drafted a vague document that could be interpreted in a manner that Marblegate transferred, at a minimum, its right to payment under the loan documents to STVT in January 2018.  Therefore, Field Point as the agent for Marblegate, is not entitled to payment under the loan documents.

194.    Likewise, there are no documents demonstrating Field Point is the agent for STVT, and STVT has not filed any proofs of claim in the Bankruptcy Case.

195.    Therefore, the Amended Marblegate Claim should be dismissed in its entirety because Field Point as the agent for Marblegate is not entitled to collect any remaining amounts represented by the claim.

196.    Second, and in the alternative, the amount sought in the Amended Marblegate Claim is not correct. At the time of the transfer, January 18, 2018, the total outstanding amount of the term loan was no more than $15,537,415.70, including principal and accrued interest. At

---

[12]    Field Point has filed the Marblegate Claim and Amended Proof of Claim in all of the Debtors' Bankruptcy Cases. This Count seeks to disallow all of the Amended Marblegate Claims, not simply the one cited above.

the time of the transfer, the Original Lender, through their Agent, transferred the Cash Collateral

in the amount of $11,561,198.90 to Field Point.

197.    The Amended Marblegate Claim's claim is wrong in at least several respects: (i)

its starting principal loan balance is $16,540,565.44, when it should have been $15,505,978.94;

(ii) it includes $75,452.17 in term loan interest, when it should have $31,436.78; and (iii) it

includes $3,432,980.59 in letter of credit fees without any explanation.

198.    Therefore, the Amended Proof of Claim's "remaining principal calculation" is

wrong and should be reduced by at least $3,976,216.92 to account for the numerical discrepancy.

199.    Accordingly, the Trustee objects to the Marblegate Claim and requests that the

Court dismiss the claim in its entirety, or alternatively. reduce the Marblegate Claim to account

for its inaccuracies.

## COUNT XIII
## Objection to Claim
*(Ancora Only)*

200.    The Trustee incorporates by reference and realleges each and every allegation

contained in the foregoing paragraphs, as though fully set forth herein.

201.    The Trustee is entitled to object to claims filed pursuant to Fed. R. Bankruptcy

Procedure 3007.

202.    Ancora filed the Ancora Claim as an unsecured claim in the amount of

$11,214,000.00.  (Case No. 18-33822, Claim No. 69-1).[13]

---

[13]     Ancora has filed the Ancora Claim and the Amended Ancora Claim in all of the Debtors'
Bankruptcy Cases. This Count seeks to disallow all of the Amended Ancora Claims, not simply
the one cited above.

203.    On October 28, 2020, Ancora amended the Ancora Claim. The Amended Ancora Claim is an unsecured claim in the amount of $6,576,000.00. (Case No. 18-33822, Claim No. 69-2).

204.    The Trustee objects to the claim on the basis that Debtors do not owe Ancora the amount sought.

205.    The Ancora Claim is based upon the NWC Provision in the Asset Purchase Agreement.

206.    Those provisions provide that once the "Main Adjustment Amount" is calculated, the payment of an adjustment amount to Ancora is to be funded by the funds in the Surety Bond Escrow Account.

207.    The Asset Purchase Agreement does not provide Ancora any right to seek a deficiency from the Debtors if the amounts in the Surety Bond Escrow Account do not equal the adjustment amount.

208.    Therefore, the Debtors do not have an obligation to pay Ancora for its claim based on the NWC Provision.

209.    Additionally, upon information and belief, Ancora did not prepare the required statements and conduct the required resolution process within the time frame in the Asset Purchase Agreement to entitle it to seek any "working capital adjustment" under the Asset Purchase Agreement.

210.    Accordingly, the Trustee objects to the Ancora Claim and requests that the Court disallow the claim in its entirety.

## RELIEF REQUESTED

WHEREFORE, Harry Shaia, Jr., Trustee, by Special Litigation Counsel, for the jointly administered estates of the Debtors, seeks entry of an order granting judgment in his favor and against the Defendants as follows:

(i)      Holding the Defendants jointly and severally liable for conversion of the $11.5 million Cash Collateral, including, but not limited to, punitive damages for such conversion, or in the alternative, requiring the Defendants jointly and severally to turnover $11.5 million to the Trustee;

(ii)      Holding the Defendants jointly and severally liable for fraudulent and voluntary conveyances pursuant to 11 U.S.C § 548(a), Va. Code § 55.1-400, -401 and requiring the Defendants to pay the unpaid value of the assets transferred plus interest pursuant to 11 U.S.C. § 550'

(iii)      Holding Defendants jointly and severally liable for aiding and abetting breaches of fiduciary duties;

(iv)      Holding Defendants jointly and severally liable for damages as a result of their civil conspiracy;

(v)      Holding Defendants jointly and severally liable for damages, including treble damages and attorneys' fees, as a result of their statutory conspiracy pursuant to Va. Code §§ 18.2-499, -500;

(vi)      Disallowing the Amended Marblegate Claim pursuant to 11 U.S.C. § 502 or Federal Rule of Bankruptcy Procedure 3007, or in the alternative, holding the Amended Marblegate Claim equitably subordinated pursuant to 11 U.S.C. § 510(c);

(vii)    Disallowing the Amended Ancora Claim pursuant to 11 U.S.C. § 502 and Fed. R.

Bank. Procedure 3007, or in the alternative, holding the Amended Ancora Claim equitably

subordinated pursuant to 11 U.S.C. § 510(c); and

(viii)    Granting such additional relief as this Court deems just.

HARRY SHAIA, JR., TRUSTEE

/s/ *Vernon E. Inge, Jr.*
Counsel

Vernon E. Inge, Jr. (Va. State Bar No. 32699)
Corey S. Booker (Va. State Bar No. 73419)
Robert N. Drewry (Va. State Bar No 91282)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:    804.977.3301
Facsimile:    804.977.3291
E-Mail:        vinge@wtplaw.com
E-Mail:        cbooker@wtplaw.com
E-Mail:        rdrewry@wtplaw.com

*Special Litigation Counsel for Harry Shaia, Jr., Trustee*